Isidore Straus et al., Composing the Firm of R. H. Macy & Company, Respondents, *v.* American Publishers' Association et al., Appellants.

Monopolies — An Agreement Which in Effect Interferes With the Unrestricted Sale of Uncopyrighted Books in this State Is Illegal under the Anti-Monopoly Act (L. 1899, Ch. 690). An agreement between publishers representing ninety-five per cent of the books published in the United States, and ninety per cent of the business done in the book trade, that all copyrighted books published by any of them after a specified date should be published and sold at retail at net prices — that such net copy-. righted books and all other books, whether copyrighted or not, or whether published by them or not, should be sold by them to those booksellers and jobbers only who would maintain the retail net price of such net copyrighted books for one year, and to those booksellers and jobbers only who would furthermore sell books at wholesale to no one known to them to cut or sell at a lower figure than such net retail price, or whose name would be given to them by the association as one who cut such prices — and that evidence shall not be required by the bookseller or jobber in order to restrain him from selling to one who has been blacklisted, but that all that shall be required to govern his action and to prevent him from selling to such persons shall be that the name has been given to him by the association as one who cuts such net prices — is an agreement, which, while purporting to secure to the owner and publisher of copyrighted books the monopoly permitted by Federal law, may, and as practically construed by the parties does operate in fact so as to prevent the sale of books of any kind or at any price to any dealer who resells, or is suspected of reselling, copyrighted books at less than the arbitrary net price, whether such dealer be a member of the association or not: such an agreement undertakes to interfere with the free pursuit in this state of a lawful business, in which a monopoly is not secured by the Federal statute, viz., that of dealing in books which are not protected by copy-

right; it is, therefore, in violation of chapter 690 of the Laws of 1899, enacted to prevent monopolies in articles or commodities of common use and to prohibit restraint of trade and commerce.

*Straus* v. *American Publishers' Assn.*, 85 App. Div. 446, affirmed.

(Argued January 19, 1904; decided February 23, 1904.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the first judicial department, entered July 30, 1903, which reversed an interlocutory judgment of Special Term sustaining demurrer to the complaint.

The nature of the action, the facts, so far as material, and the question certified are stated in the dissenting opinion.

*Stephen H. Olin* for appellants. The demurrer should have been sustained. .(*Park & Sons Co.* v. *N. D. Assn.*, 175 N. Y. 1; *M. S. S. Co.* v. *McGregor*, L. R. [App. Cas. 1892] 25; *H. P. B. F. Co.* v. *E. S. Co.*, 77 Fed. Rep. 288.) If the combination at bar is valid by the common law, as it existed prior to the statute against monopolies, it is also valid under that statute, which is declaratory of the common law. (Dwarris on Stat. 562; *Matter of Davies*, 168 N. Y. 89; *Moore* v. *City of Albany*, 98 N. Y. 410.) The agreement between each of the publishers and each of the jobbers that copyright books should be sold at retail only at such prices as the owner of the copyright saw fit to fix was lawful. (*V. T. M. Co.* v. *Fair*, 123 Fed. Rep. 424; *Bement* v. *N. H. Co.*, 186 U. S. 70.)

*Thaddeus D. Kenneson* for appellants. The arrangement or combination described in the complaint does not fall within subdivision 1 of chapter 690, Laws of 1899. (*Matter of Debs*, 158 U. S. 564; *Davis* v. *Am. Society*, 75 N. Y. 362; *Rourke* v. *E. D. Co.*, 75 App. Div. 145; *B. M. Co.* v. *Hollis*, 54 Minn. 223; *Tanenbaum* v. *N. Y. Ins. Exchange*, 33 Misc. Rep. 134; *Matter of Davies*, 168 N. Y. 89; *Arnot* v. *P. & E. C. Co.*, 68 N. Y. 558; *C. O. S. Co.* v. *Guthrie*, 35 Ohio St. 666;

*Craig* v. *McConoughy*, 79 Ill. 346.) The arrangement or combination complained of is lawful. (*Park & Sons Co.* v. *N. W. D. Assn.*, 175 N. Y. 1; *Matter of Davies*, 168 N. Y. 89.)

*John G. Carlisle* and *Edmond E. Wise* for respondents. The contracts, agreements or combinations alleged in the complaint are prohibited by statute, chapter 690, Laws of 1899, and were entered into for the purpose of restraining or preventing competition in this state in the supply and price of an article or commodity of common use and were intended to restrict or prevent the free pursuit in this state of the lawful business of selling books at retail to the injury of the plaintiffs. (*Cohen* v. *B. & J. E. Co.*, 166 N. Y. 292; *Cummings* v. *U. B. S. Co.*, 164 N. Y. 401; *People* v. *Milk Exchange*, 145 N. Y. 267; *Judd* v. *Harrington*, 139 N. Y. 105; *People* v. *Sheldon*, 139 N. Y. 251; *Leonard* v. *Poole*, 114 N. Y. 371; *Arnot* v. *P. & E. C. Co.*, 68 N. Y. 558; *Stanton* v. *Allen*, 5 Den. 434; *Hooker & Woodward* v. *Vandewater*, 4 Den. 349; *People* v. *Fisher*, 14 Wend. 9.) Not only is the combination illegal, but the means by which it seeks to achieve its ends are likewise illegal. (*Curran* v. *Galen*, 152 N. Y. 376; *Templeton* v. *Russell*, L. R. [1 Q. B. 1893] 715; *Quinn* v. *Leathene*, L. R. [App. Cas. 1891] 495; *D. W. C. Co.* v. *H. W. & C. Co.*, 3 Misc. Rep. 582; *People* v. *Duke*, 19 Misc. Rep. 292.) The defendants' claim that because some of the books they sell are copyrighted, they have a monopoly and are at liberty to make any contracts, combinations or agreements with the owners of other monopolies concerning the sale of their books even though they be contrary to the anti-trust laws of the state, or the United States, cannot be sustained. (*N. H. Co.* v. *Hench*, 76 Fed. Rep. 667; *Straight* v. *N. H. Co.*, 18 N. Y. Supp. 224; *H. P. B. F. Co.* v. *Eureka Co.*, 47 U. S. Ct. App. 157; *G. F. A. T. Co.* v. *Train*, 166 Mass. 50; *B. M. Works* v. *Perry*, 71 Wis. 495; *N. P. Co.* v. *Lagle*, 117 Fed. Rep. 624; *Densmore* v. *Schofield*, 102 U. S. 375.)

PARKER, Ch. J.   Chief Justice MARSHALL said long ago, in *Grant* v. *Raymond* (6 Pet. 217 241): " To promote the progress of useful arts is the interest and policy of every enlightened government.   It entered into the views of the framers of our Constitution, and the power ' to promote the progress of science and useful arts, by securing for limited times to authors and inventors, the exclusive right to their respective writings and discoveries,' is among those expressly given to Congress.   *   *   *   It is the reward stipulated for the advantages derived by the public from the exertions of the individual, and is intended as a stimulus to those exertions. The laws which are passed to give effect to this purpose ought, we think, to be construed in the spirit in which they have been made, and to execute the contract fairly on the part of the United States, where the full benefit has been actually received; if this can be done, without transcending the intention of the statute, or countenancing acts which are fraudulent or may prove mischievous.   The public yields nothing which it has not agreed to yield; it receives all which it has contracted to receive.   The full benefit of the discovery after its enjcyment by the discoverer for fourteen years is preserved and for his exclusive enjoyment of it during that time, the public faith is pledged."

That case and many others were considered recently by the United States Supreme Court in *Bement* v. *National Harrow Co.* (186 U S. 70), Mr. Justice PECKHAM writing.   After an examination of the cases which may be said to restrict the exceptions which grow out of a proper exercise of the police power of the state — of which *Patterson* v. *Kentucky* (97 U. S. 501) is an illustration — he says (186 U. S. 91): " Notwithstanding these exceptions, the general rule is absolute freedom in the use or sale of rights under the patent laws of the United States   The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article,

will be upheld by the courts.   The fact that the conditions in the contracts keep up the monoply or fix prices does not render them illegal."

That reasoning is employed as to patent rights.   It is equally applicable to copyrights, the protection of which was perhaps the leading object of the association and agreement attacked in this action.   And it points to the principle underlying the decision in the *Park & Sons Co. Case* (175 N. Y. 1), upon which defendants apparently rest their claim that the judgment of the Appellate Division should be reversed.   But there is a feature in this case not to be found in that one, and which requires a different judgment than the one rendered therein — which will now be pointed out.

While the leading object of this association and agreement purports to be to secure to the owner and publisher of copyrighted books that protection which the Federal government permits them to enjoy for the reasons stated by Chief Justice MARSHALL (*supra*), it does not stop there.   It also affects the right of a dealer to sell books *not* copyrighted at the price he chooses, or to sell at all, if he fails to comply with the rules of the association.   A combination creating a monopoly of the sale of books *not* protected by copyright offends against the law of this state as much as if it related to bluestone (164 N. Y. 401) or to envelopes (166 N. Y. 292), and according to this complaint, which must be accepted as true on this review, such an outcome is not only possible but probable.   But it is not of moment whether such a result is probable or not, for the test to be applied is, What *may* be done under the agreement?

Reference to the complaint makes it clear that the association has undertaken to provide for the practical exclusion from the business of selling books *not* protected by copyright all who refuse to be bound by the rules of the association.   And it appears from the complaint that the practical construction given to this agreement by those operating together under it is that if a dealer is *suspected* of selling copyrighted books at less than the arbitrary net price it is quite sufficient to exclude him from selling books altogether.   The agreement nowhere

suggests that it is the object of the association to control the sale of books not protected by copyright. Indeed, the object of the association *seems* to be merely to protect the copyrighted books. But while the other part of the scheme is apparently sought to be hidden, it is after all uncovered by the clauses authorizing the exclusion of any members of the association, or those who refuse to be bound by its rules, from selling books of *any* description.

The 15th paragraph of the complaint alleges " That during the year 1900 a number of prominent publishers, including defendants, hereinbefore described as publishers (for the purpose of securing to themselves an unreasonable and extortionate profit and at the same time with intent to prevent competition in the sale of books and for the purpose of establishing and maintaining the *prices of all books published* by them, or any of them, and *all books dealt in by them*, or any of them, and preventing competition in the sale thereof, unlawfully, illegally and contrary to the public policy and the statutes of the state of New York * * * combined and associated themselves together," etc. The 16th paragraph refers to the method of organization, and the fact of the adoption of a resolution, and an agreement to carry out their object; while the 17th states the nature of the agreement as follows: " That as a part of said unlawful scheme and combination the members of said association agreed that such net copyrighted books, *and all other books, whether copyrighted or not,* or whether published by them or not, should be sold by them to those booksellers only who would maintain the retail net price of such net copyrighted books for one year, and to those booksellers and jobbers only who would furthermore sell books [the word " copyrighted " is omitted at this point] at wholesale to no *one known to them to cut* or sell at a lower figure than such net retail price, *or whose name would be given to them by the association as one who cut such prices."*

It will be seen that while the leading object of this portion of the agreement apparently is to maintain the retail net

price of copyrighted books it operates in fact so as to prevent the sale of books to dealers who sell books of *any* kind to one who retails copyrighted books at less than the net retail price.

And the agreement further provides that evidence shall not be required by the bookseller or jobber in order to restrain him from selling to one who has been blacklisted, but that all that shall be required to govern his action, and to prevent him from selling to such a person, shall be that the name has been given to him by the association as one who cuts such net prices. It has been admitted, and must be, that the agreement may be so worked out as to deprive a dealer from selling any books whatever, thus breaking up his business.

But, it is said, that is only intended as a punishment for one who refuses to be bound by the wishes of the owner of the copyrighted book as to its selling price; in other words, that the association inflicts upon him the penalty of a destruction of his business, because of his refusal to abide by the the rules of the association. It is of course of no consequence how this course of action may be described by those who invented it, for if it be the fact that the combination which agrees to exclude others from an unprotected business violates the statute, then it matters not what excuse may be offered for it. It is the excuse, not the statute, which must give way.

The 18th paragraph of the complaint contains what purports to be a practical construction given to this agreement by the members of the association. It states " That, in pursuance of said unlawful combination and agreement, said American Booksellers' Association and its members have continuously co-operated with and assisted the American Publishers' Association and the members thereof in establishing and maintaining prices of such books, and preventing competition in the supply and sale of the same, and still continues so to do ; and plaintiffs say that in compliance with said agreement neither said associations nor any of the members thereof *will sell or supply books at any price to any dealer*, whether a

member of said association or not, and *whether such books are copyrighted or not*, or are not published by said American Book Publishers' Association or its members, *who resells, or is suspected of reselling*, such copyrighted books at less than the arbitrary net price fixed by said unlawful combination, nor will the said association nor any of their members sell or supply *any books whatever to any one who resells, or is suspected of reselling*, such copyrighted books to any dealer who thereafter sells the same at less than such arbitrary net price."

Here then we have a practical construction of the agreement — one put upon it by the parties to it — and it is such a construction as the language employed calls for. And it discloses that the parties who are acting under the agreement assume it to be their right and their duty by virtue of it not to sell or permit to be sold books of any kind or at any price to any dealer " who resells or is suspected of reselling copyrighted books at less than the arbitrary net price," whether such dealer be a member of the association or not.

The intended effect of this is to prevent any dealer who is even suspected of reselling copyrighted books at less than the net price from obtaining books at any price or on any terms, whether copyrighted or not. And it does not stop there, for the members of the association agree not to supply him *any* books at *any* price, whether he resells copyrighted books or not at less than the arbitrary net price, provided he is suspected of selling to any dealer who thereafter sells the same at less than such arbitrary net price. And this means — inasmuch as the members represent 95% of the publishers and 90% of the business done in the book trade — that he may be practically driven out of the business if any one chooses to suspect that a dealer to whom he has sold books has resold them at less than the price fixed.

The members of the association, therefore, have entered into an agreement which by its terms — as we read it, and as they have construed it in their every-day working under it — undertakes to interfere with the free pursuit in this state of a lawful

business in which any member of the community has a right
to engage, a business in which a monopoly is not secured by
the Federal statutes, namely, that of dealing in books which
are not protected by copyrights; and hence it is in violation
of chapter 690, Laws 1899, which provides : " Every contract,
agreement, arrangement or combination whereby a monopoly
in the manufacture, production or sale in this state of any
article or commodity of common use is or may be created,
established or maintained, or whereby competition in this state
in the supply or price of any such article or commodity is or
may be restrained or prevented, or whereby for the purpose
of creating, establishing or maintaining a monopoly within this
state of the manufacture, production or sale of any such article
or commodity, the free pursuit in this state of any lawful
business, trade or occupation is or may be restricted or pre-
vented, is hereby declared to be against public policy, illegal
and void."

The order should be affirmed, with costs.

GRAY, J. (dissenting).    This case, as it comes before us,
presents a complaint, alleging that the plaintiffs have suffered
injury and damage as the result of unlawful combinations and
associations entered into by the defendants, either in the form
of the American Publishers' Association, or in the form of
the American Booksellers' Association ; which were intended
to establish and to maintain the retail net prices fixed on copy-
righted books by their publishers.    A demurrer interposed by
the defendants to the complaint was sustained by the court, at
Special Term ; but it has been overruled by the Appellate
Division and that court has certified to us this question : " Are
the facts stated in the complaint in this action sufficient to
constitute a cause of action ?"    In determining this question,
we must regard as admitted all the material facts alleged by
the plaintiffs.    Though their complaint is stated at consider-
able length, much of it is matter of description or the state-
ment of legal conclusions.    The plaintiffs conduct a depart-
ment store, in the city of New York, under the name of R. H.

31

Macy & Company, and among the departments is one for the sale of books and publications in general. They have a large capital invested in their general business and their book department is one of the largest in the country; which latter fact is alleged to be due to the cheaper price placed upon the books and publications under a system of sales for cash only. It appears that publishers, who sold at retail, and other booksellers had not adhered to the "list prices," at which books were advertised, or offered, for sale at retail, but were accustomed to give large and liberal discounts to those familiar with trade customs, and the purchasing public, discovering that fact, was giving its custom to such dealers as the plaintiffs, who had placed fixed prices upon their books. In 1900, to meet a condition from which the publishing business was suffering, about ninety-five per cent, in number and in extent of business, of the publishers of all kinds of books and magazines formed the American Publishers' Association; which, upon its organization and in order "to prevent the cutting or reducing of prices on copyright books published by the members of the said association," adopted a resolution and, with its members, entered into an agreement "by which each of the members of the association agreed that all copyrighted books published by any of them after May 1st, 1901, should be published and sold at retail at net prices, that is, the published price thereof, and not be subject to any discounts." They, further, agreed, as the complaint states it, "that such net copyrighted books, and all other books, whether copyrighted or not, or whether published by them or not, should be sold by them to those booksellers only who would maintain the retail net price of such net copyrighted books for one year, and to those booksellers and jobbers only who would furthermore sell books at wholesale to no one known to them to cut or sell at a lower figure than such net retail price, or whose name would be given to them by the association as one who cut such net prices." Thereafter, the Publishers' Association caused to be organized the American Booksellers' Association to co-operate, as it is

alleged, in the "unlawful purpose of maintaining the price of copyright books and preventing competition in the sale thereof, and in the supply of all books, whether copyrighted or not." In the effectuation of this purpose the two associations have co-operated and, because of their agreement, neither of them, nor any of their members, it is alleged, "will sell or supply books at any price to any dealer, whether a member of said association or not, and whether such books are copyrighted or not, or are not published by said American Book Publishers' Association or its members, who resells, or is suspected of reselling, such copyrighted books at less than the arbitrary net price fixed by said unlawful combination, nor will the said associations nor any of their members sell or supply any books whatever to any one who resells, or is suspected of reselling, such copyrighted books to any dealer, who thereafter sells the same at less than such arbitrary net price."

In these statements, taken from the complaint, may be found the gist of this suit and all that is necessary to be considered, in my opinion, in the determination of the question whether, by such combinations and agreements, the defendants have violated the law. Other allegations relate to the refusal of the plaintiffs to join in such combinations; to the methods adopted by the defendants to prevent others from selling books to the plaintiffs, by "blacklisting" them in the book business, and by the use of coercive and intimidating measures; to the establishment by the defendants of a system of espionage, in order to secure information as to the sources of plaintiffs' supplies of books, and that, as the result of these agreements and of the methods adopted to make them effectual, publishers of books and book dealers have refused to sell books at any price to the plaintiffs, to their damage. The relief asked is, in substance, the adjudication of the unlawfulness of the combination and of the nullity of the agreement alleged and that an injunction issue restraining action by the defendants under their agreement, of any nature which may make it effectual against the plaintiffs, and, as

incidental to such equitable relief, an award of damages is asked.

Whatever else is in this complaint is but subsidiary to, and in demonstration of, the real cause of grievance; which is that, in order to maintain the retail net price of a copyrighted book, as fixed by its publisher, the defendants had entered into a combination and had agreed with each other that they would only sell to those in the trade, who would agree to maintain, and to assist in maintaining, the net retail price, and that they would not deal at all with those, who refused strict co-operation, in such respect; whether that was shown in the conduct of their own sales, or in the selling to others known by them to be "cutting" the net price. That I regard as the gravamen of this suit.

At the time of the doing of the things alleged in the complaint to have been unlawful, there was upon the statute books of this state an act, which had for its object the prevention of monopolies and the prohibition of restraints upon trade and commerce. (Chap. 690, Laws of 1899.) This statute, commonly called the Anti-Trust Law, contains three sections. The first section has a threefold purpose; in declaring to be against public policy, illegal and void, every contract, or combination, whereby a monopoly in the manufacture, production, or sale, in this state of "any article, or commodity, of common use" may be created; or "whereby competition in this state in the supply or price of any such article or commodity is or may be restrained or prevented;" or whereby the free pursuit of any lawful business may be restricted or prevented. I am unable to see how that any but the second provision of this section can bear upon the present controversy; because the owner of the copyright has a monoply under Federal laws and because the agreement complained of does not restrict the pursuit of the book business, to localities, or to persons; or otherwise than for the purpose of preventing the cutting by any one of the price of a copyrighted book, through the threatened withdrawal of all business relations with such person. Section two of the act makes it a misdemeanor, punish-

able by fine and imprisonment, for any person, or corporation, to enter into any such contract or combination. The third section provides that the attorney-general may bring an action, in behalf of the People, against any person, or corporate agency, to restrain the doing in this state of any act in consummation of any contract or combination therein prohibited.

The argument in behalf of the plaintiffs is largely, if not wholly, based upon this statute. I regard its prohibitory provisions, however, as but the declaration of a state policy; which is, to use the language of the opinion in the *Matter of Davies* (168 N. Y. 89, 101), "little more than a codification of the common law upon the subject." The contracts, agreements, arrangements and combinations prohibited by this statute were condemned at common law; but they did not, as this statute does, subject those who entered into them to criminal punishment, or make them amenable to restraint at the suit of the People. It might, possibly, be well said of this statute that, introducing no new rule of law, it now makes the contracts or combinations mentioned, which, before, were unenforceable, unlawful and criminal offenses and the subject of preventive judgments, at the instance of the law officer of the state.

If, then, the statute makes the position of the complainant no stronger at law than it was before its passage, it seems to me that the decision of this case should be controlled by our decision in *Park & Sons Co.* v. *National Druggists' Association* (175 N. Y. 1). Indeed, the decision of that case was made after the passage of chapter 383 of the Laws of 1897, of which the act in question is but the continuation and re-enactment, and the existence of the law upon the statute books was not ignored; for it was expressly referred to by Judge MARTIN, in his dissenting opinion, as a declaration of the policy of the state with reference to combinations of the nature of those described. It was, in my opinion, quite as authoritative upon the question of the lawfulness of the existing combination aimed at in the *Park* case; for, being a continuing arrangement, it could not be exempt from the operation of the act. The

action of the plaintiffs in the *Park* case was to have declared illegal the course adopted for conducting the business of the sale of proprietary medicines, as devised and carried on by the defendants through their association, under the title of the National Druggists' Association. The plaintiff was a corporation, engaged in the business of manufacturing proprietary or patent medicines and of dealing in the sale of such goods. The association was composed of wholesale and jobbing druggists, and of proprietors and manufacturers, who manufactured and sold their own proprietary articles, or chemical preparations. Its active membership controlled more than ninety per cent of the wholesale and jobbing trade. The plan, which the association had adopted and was acting under, was to require the manufacturers to compel the purchasers of their goods to contract, as selling agents, to maintain fixed selling prices, in consideration of receiving a certain fixed discount, or rebate. In order to maintain an uniform jobbing price for fixed quantities and, also, a retail selling price by the druggists, which they were to agree to maintain, it was agreed on the part of the manufacturers, at the instance of the wholesale and jobbing druggists, that they would confine their sales to persons named on a list furnished, as being those who would faithfully observe the prices and conditions named by the manufacturers. The plaintiff in that case refused to unite with the defendants; insisted upon its right to sell proprietary goods at such prices as it saw fit and sought, by its action, to restrain the defendants from continuing their efforts to prevent it from purchasing, and the manufacturers from selling to it, their goods, by way of threats and by methods of intimidation, not materially unlike those complained of in the present case. In that case the object of the combination was to establish uniform jobbing prices and retail selling prices for proprietary goods, and the plan was to enforce compliance through the threatened refusal of the proprietors and manufacturers to sell to dealers, who would not maintain the retail price. Between the two cases, there are differences in details of the methods availed of; but while

the self-defensive, or preventive, arrangements may have been more stringent and radical in the one, than in the other, case, the legal principle is not affected.   The effort, in each case, was to make effective an agreement with respect to the fixing and maintenance of the retail price of an article, as much proprietary in the one, as in the other, case, and the differences in the plan adopted, in sum, are, rather, of degree : that is, in the present case, the defendants have agreed to refuse to have any business dealings with those booksellers, who would not co-operate to the fullest extent in maintaining sales of *copyrighted books* at the retail price fixed by their publishers. It was held in the *Park* case that the proprietors of the goods, there in question, had the right to adopt such a plan with respect to the disposal thereof as they saw fit and that no one could complain.   The plan was not in restraint of trade ; for while, as it was said by Judge HAIGHT, " it is true that it does away with the competition among dealers as to prices, it creates no restriction upon them as to the quantities that they may be able to sell, or the territory within which they may confine their transactions, and, upon the question of prices, we must bear in mind that the goods are covered by patent rights and trade marks, which give the proprietors the exclusive right of specifying prices at which the articles shall be sold, and, following this, the right also to require dealers to maintain the prices specified."

This plan was not against public policy, it was held, because public policy " commends the conduct of business in such a way as to serve all consumers alike " and " one of the cardinal and chief principles of the plan adopted is the establishing of an uniform price by proprietors, which necessitates the service of all persons alike throughout the United States."   Chief Judge PARKER also speaking for the majority of the court in the *Park* case, was of the opinion, with reference to the charge in the complaint that the wholesale dealers could be proceeded against, because they compelled some, or all, of the manufacturers, against their will and inclination, to refuse to sell their goods to plaintiff, by threats, intimidation and black-

listing, as evidenced by the agreements and written plans of the association and the declared purpose of the members to carry them out to the letter, that the defendants were not doing anything except what they had a right to do. In that case, the court divided in opinion upon the sole question, whether the agreement alleged was vicious, as operating in restraint of trade and in prevention of competition.

It is difficult for me to see wherein the decision in the *Park* case is not controlling. The logical and consistent application of its doctrine must result in sustaining the demurrer here.

I can discover nothing in the purpose of these defendants, which is morally wrong, or which would deserve condemnation at common law. There is no combination to restrain competition among themselves; but, simply, an agreement among themselves to bring about more healthful conditions in a certain branch of the general bookselling trade by the maintenance of an uniform fixed retail price on a copyrighted book. That is to say; they agree that publishers of copyrighted books shall fix the net price at which such books shall be sold at retail and that those prices must be observed by all dealers; at the peril to them, if they undersell, of having business relations wholly severed. That the publisher of a copyrighted book may fix its price cannot, very well, be denied and if, by reason of a large number of publishers combining in a plan to compel the net retail price to be universally adhered to in sales, competition may be restrained, that is but an incident of the execution of a lawful plan. How can it be said that the statute in question is operative in such a case; where the copyright constitutes a monopoly, which the Federal government has granted to the publisher? The subject of these protective agreements — the very kernel, as we may say, of the combination — was the resolve of publishers to maintain throughout the trade, and everywhere, a net retail price for copyrighted books and that was to be enforced, to the extent of refusing to have any business dealings with those sellers of books — whether in treaty with the defendants or not — who refused, or connived at the refusal of

others, to sell at the price fixed. How was this unlawful? Doubtless, this resolution was of a stringent and wholesale nature; but is it inharmonious with the exclusive, or monopolistic, nature of the Federal grant of letters of copyright? I do not think so. When, in innovation of the common law, the Congress of the United States exercised its constitutional power to enact copyright and patent laws, it was the purpose that authors and inventors should have monopolies in the ownership and disposition of the subject of the patent, or copyright. It does not seem to me, therefore, that any plan, however radical, which is adopted for the protection of the enjoyment of the monopoly and, especially, one which, simply, results in producing absolute uniformity of price rates, can be said to be within the operation of the state law against combinations and agreements for the creation of monopolies, or for the prevention of competition.

The United States Supreme Court, in its consideration of the act of Congress, known, commonly, as the Sherman Anti-Trust Act, (passed July 2d, 1890), which declared that " every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade, or commerce, among the States " etc., was illegal, has interpreted it as aiming only at a contract, or combination, which has for its direct purpose the restraint of interstate trade, or commerce, and as not comprehending a case, where the restraint was an incidental result. (*Anderson* v. *U. S.*, 171 U. S. 604.) In that case, by the by-laws of an association, its members were forbidden to buy, or sell, cattle from, or to, traders, not members of the exchange, or to buy from commission men, who bought from, or sold to, non-members. The United States sought to dissolve the association and to enjoin the members from carrying out their exclusive rules, upon the theory that they were engaged in interstate commerce. But the Federal Supreme Court held, if that were so, that, nevertheless, the combination was not within the purview of the statute, and that the agreement did " not restrict competition among the defendants for the class of cattle dealt in by them."

At common law those combinations were condemned, wherein the persons in combination had agreed between themselves to restrict the production and the supply of some article of prime necessity ; for the reason that, as constituting an immediate restraint upon trade and upon competition, it was a detriment to the public and, hence, contrary to public policy. They were not condemned by legislation as illegal and criminal ; but the courts refused to enforce the agreement. What the law of this state aims at, in undertaking to stamp any of the described combinations and contracts as an unlawful and criminal act, is to prevent an agreement being carried out between persons, which looks to the restraint of competition between themselves in, and to the controlling of the production and price of, articles of common use. It was, upon a reasonable reading, intended to operate upon contracts, whose *direct* effect was to restrain trade, or to prevent competition between its parties, within this state, and its operation should not be extended to cases where the effect was an incident of some plan not, itself, unlawful. And, as I have before suggested, the monopolies aimed at were those which the contract of the combination might create and, clearly, not those which were created by the law of the land.

But this contract of the combination, analyze it how you may, had no other reason, nor purpose, than to protect, in as drastic ways as the parties could devise, the trading business of publishers of copyrighted books. There was no "pooling" in the arrangement ; nor was there any restraint imposed upon the parties to it as to competition in the production and the sale of some article, which *all* were engaged in producing and which *all* were free to supply. The contract did not extend to uncopyrighted books ; other than by way of penalty, as the refusal to deal in them might be incidental to the refusal to deal with booksellers, who would not live up to, or who would not co-operate in, an agreement to maintain the net retail price of a *copyrighted* book. It is not unlawful for a person to refuse to deal with others, as his judgment, or fancy, may impel him. His business is his own and the only limita-

tion upon his pursuit of it is that he shall not interfere with the legal rights of others.   It seems to me that what he may lawfully do himself, he may unite with others in doing, if of some common advantage.   (See *Park & Sons Co.* v. *National Druggists' Association, supra ; Anderson* v. *U. S., supra ; Macauley* v. *Tierney,* 19 R. I. 255 ; *Bohn Manufacturing Co.* v. *Hollis,* 54 Minn. 223.)   Combinations for the prevention of competition have been, commonly, understood to be made between those, who, themselves, have been competitors in the particular business and who enter into an agreement with each other to regulate the price of the particular article of necessity traded in.   The agreement alleged here is not of that nature.   If the law is violated by this agreement, it is not because competition between the parties is to be suppressed ; for their object is, solely, to maintain the net retail prices, which they, as publishers, have *rightfully* fixed on the copyrighted books they are selling.   What competition is prevented must be, plainly, that incidentally occurring between booksellers ; who, for some advantage to be gained in their business, would sell such books, under the retail price fixed by their publishers. But, if that is the test to be applied to the legality of the combination, or of the agreement, attacked, it appears to me to be an extraordinarily inaccurate one and quite beyond the intent of a statute, supposed to incorporate the common-law rule.

To summarize, as it has been well done in the argument of the appellants' counsel ; the purpose of the parties to this contract, to maintain one price for the same book to all retail buyers, was limited to *copyrighted* books, published by members of the American Publishers' Association, and did not extend to uncopyrighted books, whether published by such members, or by others.   Nor was any party restrained from selling uncopyrighted books and uncopyrighted books only to any person, provided such person does not buy, or sell, copyrighted books published by the members of that association. It is only to dealers, who, themselves, insist upon selling *at retail* the copyrighted books of the members of the associa-

tion at prices less than the net prices fixed by the publishers, or who insist upon reselling *at wholesale* such copyrighted books to such dealers, that the parties to the combination are restrained from selling.

I am led to the conclusion, after a careful consideration of the question presented, upon principle as upon the authority of the *Park* case, that the question certified should be answered in the negative and, therefore, I think that the order of the Appellate Division should be reversed and that the order of the Special Term should be affirmed.

BARTLETT, J. (dissenting). I agree with the opinion of Judge GRAY.

The agreement attacked has for its sole object the protection of copyrighted books. I consider the construction given to it by Judge GRAY is logical, conducive to the best interests of trade and consistent with the latest utterance of this court on the subject. (*Park & Sons Co.* v. *National Druggists' Association*, 175 N. Y. 1.)

It cannot be reasonably said that a publisher of books protected by copyright, and a dealer in books generally, may not say to his customers in the trade, that if they cut the prices of his copyrighted books he will sever business relations absolutely.

If this be so, and I do not understand it can be successfully questioned, why may not any number of men similarly situated agree to adopt that policy ?

There is a phase of this case that has not been specially discussed, but which may be considered by way of argument. The refusal to maintain trade relations with a given individual is an inherent right which every person in business may exercise, for reasons he deems sufficient or for no reason whatever. It is a part of that liberty of action which the Constitutions, State and Federal, guarantee to the citizen.

This case discloses one of the saddest phases of our modern business life.

It is a well-known fact that the great department stores of

the country have encroached upon many lines of trade entirely distinct from the main and legitimate business in which they are engaged.    As an illustration, a dry goods establishment, engaged in selling a vast number of articles legitimately related to its business, concludes, in order to promote its principal trade, to offer for sale books, furniture, druggists' sundries and numerous other articles that need not be mentioned, at cut prices, representing only the cost of production, and oftentimes far below it.    The inevitable effect of this policy is to draw a large number of people to these establishments, and in the final result the dealer makes good his losses in the outside trade by the prices he obtains in his legitimate business.

It may be fairly assumed that the general business is conducted at a profit.

The result is a large number of the retail dealers in the various kinds of articles thus undersold are driven out of business, many of them at a time of life when they are unable to reinstate themselves in some other calling.

It also results in great damage to manufacturers, producers and wholesale dealers in loss of customers who have been driven into insolvency.

It is, of course, true that the proprietors of department stores have the legal right to offer to the public goods of any kind at prices below production, or, indeed, may donate them to their customers.    It is, however, equally true that the manufacturers, producers and wholesale dealers may say to the men whose policy is thus carrying ruin and destruction to their business and that of their customers, that if you persist in this disastrous cutting of rates we will sever all business relations absolutely.    These are mutual and inherent rights, in the nature of things, so long as self-defense and the privilege to exist survive among men.

HAIGHT, MARTIN, VANN and WERNER, JJ., concur with PARKER, Ch. J.; GRAY and BARTLETT, JJ., read dissenting opinions.

Order affirmed.