R. LYLE SCHILL *v.* REMINGTON PUTNAM BOOK COMPANY

[No. 47, October Term, 1940.]

*Decided January 3rd, 1941.*

The cause was argued before BOND, C. J., SLOAN, MITCHEL, JOHNSON, and DELAPLAINE, JJ.

*Herbert M. Brune, Jr.,* with whom were *Brune & Gordon* on the brief, for the appellant.

*W. H. Crichton Clarke,* with whom was *Michael F. Delea* on the brief, for the appellee.

MITCHELL, J., delivered the opinion of the Court.

Both the appellant and appellee in this case are booksellers engaged in that line of trade in the city of Baltimore; and this appeal is from an order of the Circuit Court No. 2 of that city, overruling the appellant's demurrer to the appellee's bill of complaint. The basic question raised is whether the Fair Trade Act, as embodied in sections 102 to 110, inclusive, of article 83 of the Annotated Code of Maryland (1939), is applicable to copyrighted books.

The bill of complaint alleges that pursuant to the provisions of the act the appellee, on November 10th, 1939, entered into a contract, to take effect as of November 1st, 1939, with Simon & Schuster, Inc., of New York, a publisher engaged in publishing and selling books, that the appellee during the life of the contract would not advertise, offer for sale or sell to any consumer, at less than the fair trade price, any books bearing the publisher's trade-mark, brand or name; it being agreed that the publisher would stipulate a minimum resale price to the consumer in compliance with the Fair Trade Act of this State, in the publisher's current monthly catalogue, and that all books contained in said catalogue were to be sold at the fair trade price, with exceptions as follows: (a) books sold for circulating or public service purposes and

not for resale; (b) charitable, religious or educational purposes at not less than 25 per cent below the fair trade price; (c) sales to book clubs; (d) government agencies; (e) mail order houses selling exclusively by mail; and (f) miscellaneous sales not generally intended for resale by the purchasers. It is further alleged that the appellant was cognizant of the fact that the appellee had entered into the contract referred to, and of the terms and conditions thereof, including the established fair trade price to the consumer; and moreover, that in spite of the fact that the appellant had been repeatedly requested to desist from violations of said contract, he has nevertheless violated the terms thereof, contrary to the provisions of said act; the specific complaint being that the appellant on January 30th, 1940, sold to an ultimate consumer a book entitled "Art Masterpieces" for the sum of $8.50, whereas the minimum consumer's price fixed by said contract was $10. Alleging also that the appellee is without redress in law, the prayer for relief is that the appellant be temporarily and permanently enjoined and restrained from violating said contract.

The Fair Trade Act, as adopted in this State by chapter 239 of the Acts of 1937, differs but little, if any, from similar legislation now in force in nearly every State in the Union. And it may be added that as far as our investigation goes, wherever the constitutionality of the several state statutes has been challenged, they have been sustained by the appropriate court of last resort. So also the validity of such legislation has been sanctioned by the Supreme Court of the United States. *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.* (McNeil v. Joseph Triner Corp.), 299 U. S. 183, 57 S. Ct. 139, 81 L. Ed. 109; *Pep Boys, etc., v. Pyroil Sales Co.* (Kunsman v. Max Factor & Co.), 299 U. S. 198, 57 S. Ct. 147, 81 L. Ed. 122.

In line with the judicial trend above indicated, this court in the recent case of *Goldsmith v. Mead Johnson & Co.*, 176 Md. 682, 7 A. 2nd 176, has upheld the constitutionality of the Maryland Fair Trade Act; it being in

that case, *inter alia*, contended that the Act was in conflict with (a) articles 23 and 41 of the Declaration of Rights of this State, and (b) the 14th Amendment to the Constitution of the United States. So far, therefore, as the act adopted in this State is concerned, the same is a valid exercise of legislative power, and in brief, authorizes and sanctions contracts establishing minimum retail prices on commodities which bear the trade-mark, brand or name of the producers or distributors, and which are in free and open competition with "commodities of the same general class produced or distributed by others." It therefore follows that anyone who wilfully and knowingly advertises, offers for sale or sells any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of the act, whether such person is or is not a party to such contract, is engaged in unfair competition, and is subject to suit on the part of any person damaged thereby.

Without challenging the constitutionality of the act, the appellant contends that it cannot and does not cover copyrighted books. Furthermore, it is submitted that regardless of the conclusion of the court as to the main controversial question involved, the instant contract, upon which the bill of complaint is based, contains no proper stipulation as to price, and that its terms are so uncertain, inequitable and unfair, and embrace such unreasonable exemptions, as to preclude its enforcement in a court of equity.

As indicated, it is contended by the appellant that notwithstanding the act, by its express terms, includes "publishers," it is not intended to apply to copyrighted books distributed by publishers, for the alleged reason that such type of books are not "commodities" within the meaning of that term as used in the act; and that in any event, because it deals with contracts relating to "commodities" in "free and open competition with commodities of the same general class produced or distributed by others," one copy of a literary work cannot be in competition with another copy of the same book. The

act defines "commodity" as "any subject of commerce"; and while the word "commerce" in itself is a broad term, its ordinary meaning, as applied to trade, is the exchange of goods or property of any kind for money, or for other goods or property. Under such definition there can be no doubt that a book, as physical property, is an article adapted to commerce. However, the act goes further, and declares what type of contract fixing resale prices, between the producer (or publisher) and one buying for the purpose of resale, may be enforced as against either a party to the contract or a non-signatory thereto; and provides that the contract must relate to commodities in "competition" with other like commodities. A book, then, to be subject to the provisions of the act, must be found to be in competition; but in competition with what? Competition implies a struggle for advantage between two or more forces, each possessing in substantially similar if not identical degree, certain characteristics essential to the contest; and as used in political economy, is thus defined in Funk & Wagnalls' dictonary: "An independent endeavor of two or more persons to obtain the business patronage of a third by offering more advantageous terms as an inducement to secure trade."

Reverting for the moment to the reason for the enactment of fair trade legislation, it will be observed that it is designed to protect commodities subject to trade which, independent of their physical value, embody a trade-mark, brand or copyright, which is recognized by governmental agencies as a valuable property right vested by law in the inventor or author as a reward for genius. At common law a general restraint upon alienation is ordinarily invalid. "The right of alienation is one of the essential incidents of a right of general property in movables, and restraints upon alienation have been generally regarded as obnoxious to public policy, which is best subserved by great freedom of traffic in such things as pass from hand to hand. General restraints in the alienation of articles; things, chattels, except when a very special kind of property is involved, such

as a slave or an heirloom, have been generally held void. 'If a man,' says Lord Coke, in 2 Coke on Littleton, sec. 360, 'be possessed * * * of a horse or of any other chattel, real or personal, and give or sell his whole interest or property therein, upon condition that the donee or vendee shall not alien the same, the same is void, because the whole interest and property is out of him, so as he hath no possibility of a reverter; and it is against trade and traffic and bargaining and contracting between man and man.' " *Dr. Miles Med. Co. v. John D. Parks & Sons Co.*, 220 U. S. 373, 404, 31 S. Ct. 376, 383, 55 L. Ed. 502. It should be borne in mind that the act is not designed to deal with the commodity *qua* commodity, but with a commodity identified by a copyright belonging to the publisher; and the essence of the statutory violation consists not in the bare disposition of the commodity, but in the forbidden use of the copyright in accomplishing such disposition. As stated by Mr. Justice Sutherland in *Old Dearborn Distributing Co. v. Seagram-Distillers Corp., supra* (299 U. S. 183, 57 S. Ct. 144, 81 L. Ed. 109). "The primary aim of the law is to protect the property —namely, the good will—of the producer, which he still owns. The price restriction is adopted as an appropriate means to that perfectly legitimate end, and not as an end in itself. Appellants here acquired the commodity in question with full knowledge of the then existing restriction in respect of price which the producer and wholesale dealer had imposed, and, of course, with presumptive if not actual knowledge of the law which authorized the restriction. Appellants were not obliged to buy; and their voluntary acquisition of the property with such knowledge carried with it, upon every principle of fair dealing, assent to the protective restriction, with consequent liability * * * by which such acquisition was conditioned. * * * We are here dealing not with a commodity alone, but with a commodity plus the brand or trade-mark which it bears as evidence of its origin and of the quality of the commodity for which the brand or trade-mark stands. Appellants own the commodity; they

do not own the mark or the good will that the mark symbolizes. And good will is property in a very real sense, injury to which, like injury to any other species of property, is a proper subject for legislation. Good will is a valuable contributing aid to business—sometimes the most valuable contributing asset of the producer or distributor of commodities and distinctive trade-marks, labels and brands, are legitimate aids to the creation or enlargement of such good will. * * * The ownership of the good will * * * remains unchanged, nothwithstanding the commodity has been parted with."

In other words, the act now before us is designed to sustain the minimum price fixed by a contract entered into in accordance with its provisions, upon the commodity covered by its terms; and, varying from the normal course of trade, prohibits the purchaser or owner of a commodity which bears, or the label or container of which bears, the trade-mark, brand or name of the producer or distributor of such commodity, from reselling the same below such established minimum price to a consumer. The act therefore interferes with normal trade in the indicated commodities solely for the purpose of protecting the good will of the producer or distributor; and when applied to the facts in the instant case, proceeds upon the theory that the retail sale of a copyrighted book at less than the price fixed by the owner of the copyright is an assault upon the good will, and constitutes what the statute denominates unfair competition. *Liberty Warehouse Co. v. Burley Tobacco Growers' Co-op. Marketing Assn.*, 276 U. S. 71, 48 S. Ct. 291, 72 L. Ed. 478.

In *American Tobacco Co. v. Werckmeister*, 207 U. S. 284, 28 S. Ct. 72, 73, 52 L. Ed. 208, it is said: "A copyright, as the term imports, involves the right of publication and reproduction of works of art or literature. A copyright, as defined by *Bouvier's Law Dictionary*, Rawles' edition, volume 1, p. 436, is: 'The exclusive privilege, secured according to certain legal forms, of printing, or otherwise multiplying, publishing, and vend-

ing copies of certain literary or artistic productions.'
* * * 'The foundation of all rights of this description is
the natural dominion which everyone has over his own
ideas, the enjoyment of which, although they are em-
bodied in visible forms or characters, he may, if he
chooses, confine to himself or impart to others.' That
is, the law recognizes the artistic or literary productions
of intellect or genius, not only to the extent which is in-
volved in dominion over and ownership of the thing
created, but also the intangible estate in such property
which arises from the privilege of publishing and selling
to others copies of the thing produced."

In a recent publication entitled: "Price Control under
Fair Trade Legislation," by E. T. Grether, professor of
economics at the University of California, it is said:
"The intrinsic characteristics of books and the simplicity
of the organization of the trade make them peculiarly
susceptible to resale price control. Books are true pro-
prietary products with legal rights or ownership pro-
tected by copyrights. Within a given printing each copy
of a given book duplicates exactly every other copy. The
sale of books, like the sale of magazines and newspapers,
is much more dependent upon time factors than is the
sale of many commodities. * * * It is because dealers
often guide the selection of books that the use of books
as leaders so greatly perturbs the publishers. When a
given title is cut heavily by, say, a department store, the
regular booksellers may, and often do, exercise their
powers as counsellors to swing business into other
channels."

If the reading public bought books generally without
regard to titles or subject matter, undoubtedly price
variations tending to encourage the purchase of the
cheaper volumes would justify a description of the situa-
tion as one of competition. But the classical student
originally bent on securing a copy of Plato's "Republic"
would not shift his choice to a detective story, merely be-
cause the latter could be obtained for less money. Nor
would the civil engineer, seeking a text-book on water

supply, purchase a theological treatise as an alternative to expending a larger sum for a technical work desired. It follows therefore, that if it is to be said that competition, as defined in the act, exists in the bookselling business, it must be found in connection with books of almost, if not entirely, identical contents.

Chief Justice Marshall said long ago, in *Grant v. Raymond*, 6 Pet. 218, 241, 8 L. Ed. 376: "To promote the progress of useful arts, is the interest and policy of every enlightened government. It entered into the views of the framers of our constitution, and the power 'to promote the progress of science and useful arts, by securing for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries,' is among those expressly given to congress. * * * It is the reward stipulated for the advantages derived by the public for the exertions of the individual, and is intended as a stimulus to those exertions. The laws which are passed to give effect to this purpose ought, we think, to be construed in the spirit in which they have been made; and to execute the contract fairly on the part of the United States, where the full benefit has been actually received; if this can be done, without transcending the intention of the statute, or countenancing acts which are fraudulent, or may prove mischievous. The public yields nothing which it has not agreed to yield; it receives all which it has contracted to receive. The full benefit of the discovery, after its enjoyment by the discoverer for fourteen years, is preserved; and for his exclusive enjoyment of it, during that time, the public faith is pledged."

Time has not dimmed the wisdom and justice of that comment, and the Fair Trade Act is but evidence of the legislative intent to reaffirm it, and give to it practical effect, in this State at this late date. In line with similar legislation, which, as has been noted, has been adopted by many States of the Union in recent years, its enactment in Maryland followed swiftly in the wake of the passage of the Tydings-Miller amendment to the Sher-

man Anti-Trust Act, as amended August 17th, 1937, 15 U. S. Code Ann. sec. 1.

The obvious purpose of that amendment was to strengthen the principle of fair trade legislation as an economic policy, by removing barriers incident to interstate commerce in so far as the same affected commodities bearing the trade-mark, brand or name of the producer or distributor of commodities in free and open competition with commodities of the same general class produced by others.

We are not unmindful of the fact that in the instant case counsel for the appellant, while apparently conceding the wisdom of fair trade legislation as an economic principle, nevertheless urge that, with respect to copyrighted books, the only competition is the price competition that may be offered by other sellers of the same book; and that if the statute permits price-fixing of such books, all competition is at an end and the public suffers. In that event, they contend that the reasoning upon which the validity of the act was sustained by this court would no longer apply, because, under the facts incident to the case at bar, the creation of "an unreasonable monopoly" would be permitted.

That contention, however, entirely ignores the fact that, in innovation of the common law, the Congress of the United States, in the exercise of its constitutional power, has enacted copyright and patent laws, to the end that authors and inventors may have, for limited periods, monopolies in the ownership and disposition of the subject of the copyright or patent. The legal remedy afforded in cases like the one now before us is not derived from powers acquired as an incident to the monopoly granted under the copyright law; it emanates from the act of the Legislature permitting suits of the nature indicated to be maintained, and we are not disposed to restrict the protection accorded "publishers" as contemplated by the act, to that limiting their activities, with respect to maintaining fair trade prices, to uncopyrighted books only.

We have found no adjudicated case, and none has been

referred to us, in which the question whether copyrighted books may logically be the subject of competition, has been directly decided. But in *Straus v. American Publishers' Assn.*, 177 N. Y. 473, 69 N. E. 1107, it is interesting to note that as early as 1904 the question of competition in sales of copyrighted books was raised, and that while that case was decided upon grounds other than the one now before us, the principle of the right of a copyright owner to maintain a minimum price with respect to the subject of the copyright was approved. It is also noted that in the case of *Doubleday, Doran & Co. v. R. H. Macy & Co.*, 269 N. Y. 272, 199 N. E. 409, a New York statute substantially similar to the Maryland Fair Trade Act was declared unconstitutional by the Court of Appeals of New York; and that subsequently, because of the decision in the case of *Old Dearborn Distributing Co. v. Seagram-Distillers Corp., supra,* the New York court overruled its former decision and declared its state statute constitutional. *Bourjois Sales Corp. v. Dorfman,* 273 N. Y. 167, 7 N. E. 2nd 30.

At least since the passage of the Tydings-Miller amendment to the Sherman Anti-Trust Act, supra, it can no longer be seriously contended that a fair trade act, such as the Maryland statute now before us, is in conflict with the Sherman Anti-Trust Act, forbidding contracts and combinations in restraint of trade and with respect to interstate commerce. *Old Dearborn Distributing Co. v. Seagram-Distillers Corp., supra; Pep Boys, etc. v. Pyroil Sales Co., supra; Goldsmith v. Mead Johnson & Co., supra,* and cases cited.

Finally it is urged by the appellant: (a) That the contract between the publisher and bookseller, the appellee, is void in that the exemptions in said contract are in violation of the Maryland Fair Trade Act; and (b) that the instant contract does not comply with said act, in that it provides that the buyer will not resell the commodity involved "at less than the minimum price stipulated by the seller"; it being contended that the stipulated price should be definitely set out in the contract, whereas in the instant contract the stipulated fair mini-

mum price is fixed as being the list price in the seller's current monthly catalogue.

In our opinion, neither of the above contentions is well founded. As to the first, it does not appear that the Fair Trade Act precludes exemptions from the contract contemplated by its provisions, and we can see no logical objection to reasonable exemptions agreed upon by the parties to the contract. The appellant is not a party to the document; his interests are not affected in any manner by the same, unless and until, by virtue of the statute, he elects to be bound by the contract, in that he voluntarily decides to buy and sell the particular commodity upon which the minimum price is fixed.

As to the second contention, the contract expressly stipulates that the fair trade price is fixed by the list price in the publisher's current monthly catalogue, which definitely implies that the price is subject to change, in the discretion of the publisher, and at the same time, for practical business purposes, maintains a minimum price without requiring the redrafting of the contract upon the occasion of any monthly exercise of the discretion reserved by the publisher.

For the reasons stated, the order appealed from will be affirmed.

*Order affirmed, with costs to the appellee.*

On Motion for Reargument.

The opinion was rendered *per Curian.*

A motion for reargument is based mainly on the assumption that the case of *Straus v. American Publishers' Assn.*, 177 N. Y. 473, 69 N. E. 1107, cited in the opinion, was the basis of the decision in this case and that the Straus case was reversed by the Supreme Court of the United States, 235 U. S. 716. But the Straus case was not the basis of decision in this case, which is in application of a later statute and decision of the Supreme Court of the United States. *Doubleday, Doran & Co. v. R. H. Macy & Co.*, 269 N. Y. 272, 190 N. E. 409; *Bourjois Sales Corp. v. Dorfman*, 273 N. Y. 167, 7 N. E. 2nd 30.