THE TEXAS COMPANY, A DELAWARE CORPORATION, PLAINTIFF-APPELLANT, v. MARCO DiGAETANO, T/A MARCO'S SERVICE STATION, DEFENDANT-RESPONDENT.

Argued November 19, 1962—Decided January 21, 1963.

*Mr. Milton Handler,* of the New York Bar, argued the cause for the appellant (*Messrs. Katzenbach, Gildea & Rudner,* by *Mr. Samuel Rudner,* attorneys; *Mr. Amzy B. Steed,* of the New York Bar, of counsel).

*Mr. Walter J. Bilder* argued the cause for the respondent (*Messrs. Bilder, Bilder & Freeman,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The Appellate Division set aside the Chancery Division's refusal to vacate a 1958 default judgment against the defendant and remanded the cause for further proceedings. 71 *N. J. Super.* 413 (1962). We granted certification on the plaintiff's application. 37 *N. J.* 225 (1962).

In 1956 The Texas Company adopted a resale price-fixing program pursuant to New Jersey's fair trade act. *N. J. S. A.* 56 :4–3 *et seq.* It entered into an agreement with one of its retail gasoline dealers and gave notice thereof to its other retail dealers. The agreement fixed minimum retail selling prices for Texaco Fire Chief and Texaco Sky Chief gasoline and stipulated that the Company could, by notice, eliminate or add products and change their minimum prices. From time to time the minimum prices were changed and in a notice dated November 28, 1956 the Company advised its retail dealers that its minimum prices did not apply to sales "to purchasers to whom delivery is made by tankwagon or truck transport into bulk storage facilities maintained by such purchasers." In 1957 the Company advised the defendant that it had information that the defendant was selling Texaco gasoline below the minimum prices and it demanded that he terminate such conduct. The defendant failed to do so and the Company then filed a complaint in the Chancery Division seeking injunctive relief. After various steps outlined in the opinion of the Appellate Division (71 *N. J.*

*Super.,* at *pp.* 419–421), a default judgment was entered on January 20, 1958. The judgment permanently enjoined the defendant from selling the plaintiff's gasoline at less than the fixed minimum retail prices and from using the plaintiff's equipment or trademarks in connection with any such prohibited sales.

In 1960 the defendant moved to vacate the earlier default judgment. Affidavits accompanying his notice of motion set forth that in September 1958 the plaintiff had amended its fair trade agreement to provide that its minimum retail prices shall not apply to sales made by the retailer to employees of the Company or the retailer or to government agencies "or to commercial or industrial concerns or institutional establishments." The affidavits also set forth that the plaintiff was "in actual competition" with its retail dealers, including the defendant, in that it was engaging in sales to and was soliciting purchases by various establishments which were purchasing gasoline for their own use as consumers rather than for resale. During argument on the motion to vacate, counsel for the defendant referred not only to the affidavits but also to a deposition by Mr. Heard, a sales engineer employed by the plaintiff. Mr. Heard had testified that "commercial consumers" were not covered by the fair trade agreement and that sales to them were "on a competitive basis." He had also testified that in December 1957 he called upon one of the defendant's customers and offered to sell gasoline to him at "a consumer tankwagon price" which was considerably below the minimum retail prices fixed by the fair trade agreement.

The plaintiff submitted no affidavits in opposition to the motion to vacate. Instead it relied largely on its legal contention that the issues were determined with finality by the judgment of January 20, 1958 and that nothing had been presented warranting relief under *R. R.* 4:62–2. See *Hodgson v. Applegate,* 31 *N. J.* 29 (1959). It acknowledged that the defendant's affidavits indicated that the plaintiff was selling to certain commercial consumer accounts but it

pointed out that in the earlier stages of the proceeding it had affirmatively admitted that it "does sell to commercial consumer accounts and solicits such accounts." It noted that originally there had been reference to 5 commercial consumer accounts and that the defendant now referred to only 1 additional account. It contended that its September 1958 exemption of commercial accounts was legally valid and did not impair its right to enforce minimum resale prices covering retail sales to ordinary motorists.

Its position with respect to the precise meaning and scope of the exemption in favor of commercial accounts was rather obscure. At one point during the argument on the motion to vacate, Judge Kingfield asked counsel for the plaintiff whether a consumer with two trucks would be considered as a commercial account. In response, counsel stated that he was not speaking with any authority but believed that the judgment would in the first instance be that of the dealer who would have to determine whether it was "profitable for him to consider this a wholesale or commercial consuming account." Later, counsel supposed that one truck might be sufficient under certain circumstances, and still later expressed the view that the retailer could properly make a deal, dependent on the quantity being purchased, with the local "factory or baker or trucker" for gasoline at a price below the minimum price fixed in the fair trade agreement. In this connection he remarked: "We say now that that area is certainly not within fair trade as far as Texaco is concerned"; and he suggested that the sale could properly be made below the retailer's posted price but this suggestion was evidently made without reference to *N. J. S. A.* 56:6–2.1 *et seq.* See *Fried v. Kervick,* 34 *N. J.* 68 (1961).

In the Appellate Division, Judge Conford rejected the plaintiff's contention that in view of the 1958 judgment the defendant was now barred from raising the issues he seeks to present. Pointing out that the judgment was by default and stressing that the issues were not private in nature but involved matters of public concern, he concluded that the de-

fendant had made a sufficient showing for relief under *R. R.* 4:62–2. 71 *N. J. Super.*, at *pp.* 423, 429, 431. See *Mercoid Corp. v. Mid-Continent Invest. Co.*, 320 *U. S.* 661, 64 *S. Ct.* 268, 88 *L. Ed.* 376 (1944); *Gulf Oil Corporation v. Mays*, 401 *Pa.* 413, 164 *A.* 2d 656 (*Sup. Ct.* 1960); 109 *U. Pa. L. Rev.* 617 (1961). We agree and add that, in any event, the plaintiff's subsequent amendment of its fair trade agreement to exempt sales to commercial or industrial concerns or institutional establishments, presents an important issue which was in nowise determined or precluded by the earlier judgment. See *Johnson & Johnson v. Weissbard*, 11 *N. J.* 552, 555 (1953).

Judge Conford dealt comprehensively with the question of whether the plaintiff was barred by federal law from enforcing its minimum resale prices against the defendant, a retailer with whom it was engaged in competition, at least in some sense. He referred (1) to the breadth of the provision in the Miller-Tydings Amendment of the Sherman Act (15 *U. S. C. A.* § 1) and the McGuire Amendment of the Federal Trade Commission Act (15 *U. S. C. A.* § 45(a)) that the legalizing of fair trade minimum resale prices shall not make lawful any agreements fixing prices "between persons, firms, or corporations in competition with each other"; (2) to the sweep of Chief Justice Warren's language in *United States v. McKesson & Robbins, Inc.*, 351 *U. S.* 305, 312, 76 *S. Ct.* 937, 941, 100 *L. Ed.* 1209, 1216 (1956), and the Supreme Court's very strict approach to exceptions from the anti-trust laws (351 *U. S.*, at *p.* 316, 76 *S. Ct.*, at *pp.* 944, 945, 100 *L. Ed.*, at *p.* 1218; see also *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 *U. S.* 384, 71 *S. Ct.* 745, 95 *L. Ed.* 1035 (1951)); and (3) to *Esso Standard Oil Co. v. Secatore's, Inc.*, 246 *F.* 2d 17 (1 *Cir.*), *cert.* denied, 355 *U. S.* 834, 78 *S. Ct.* 54, 2 *L. Ed.* 2d 46 (1957), where the Court of Appeals for the First Circuit held that a gasoline producer could not enforce fair trade minimum resale prices against a retailer where the evidence showed that there was competition (beyond *de minimis*) between the producer and

the retailer for so-called commercial accounts consisting mainly of operators of fleets of trucks or taxicabs.

In *Secatore's* the plaintiff had not exempted such accounts from its fair trade agreement but it contended, alternatively, that notwithstanding its competition with the retailer for such accounts it was entitled to have its minimum resale prices enforced with respect to retail sales to ordinary motorists. The Court of Appeals for the First Circuit rejected this contention in the light of the broad language in the Congressional provision and the very strict approach to anti-trust exceptions in *McKesson & Robbins* and *Schwegmann*. Several District Court cases have differentiated *Secatore's* on finding that there was an express exemption of so-called commercial accounts from the fair trade agreement (*cf. General Electric Company v. Hess Brothers, Inc.*, 155 *F. Supp.* 57 (*E. D. Pa.* 1957); *Fiumara v. Texaco, Inc.*, 204 *F. Supp.* 544 (*E. D. Pa.* 1962)), but Judge Conford found their differentiation to be impermissible in view of the strong reasoning and actual holding in *Secatore's*. 71 *N. J. Super.*, at *p.* 428. See Bermingham, "Legal Aspects of Petroleum Marketing Under Federal and California Laws," 7 *U. C. L. A. L. Rev.* 161, 254–255 (1960);[1] *Note*, 26 *Geo.*

---

[1] In discussing *McKesson & Robbins* and *Secatore's*, Bermingham had this to say:

"These decisions, if given the full effect their language seems to indicate, might be construed as making resale price maintenance impossible for any dual-function seller who operates at a level that is functionally the same as any of his resellers or who, regardless of the label that may be put on functional classifications, competes with any of his resellers. On the latter point the competition referred to apparently does not mean actual competition for the patronage of the same customers. The competitive test is satisfied if both the supplier and any of his resellers are competing in rendering the same service, so that a customer could satisfy his needs from either even though there is actually no vying between them for his trade. It is enough that they sell to the same class of customers.

Also, if *Secatore* is to be strictly and literally applied, it would seem that such a dual-function supplier cannot get himself out of this legal straitjacket by excluding from his fair trade agreements the class of customers that both he and one or more of his resellers are serving." 7 *U. C. L. A. L. Rev.*, at *pp.* 254–255.

*Wash. L. Rev.* 469, 473–474 (1958). Although we incline towards his persuasively stated position (71 *N. J. Super.*, at *pp.* 424–428), we believe that further inquiry as to the history and meaning of the federal law need not be pursued here, since the particular case at hand may rightly be concluded under principles of State law. See *Sinclair Refining Co. v. Blight Bros.*, 49 *Luz. L. Reg.* 143, 20 *Pa. Dist. & Co. R. 2d* 794, 798 (*Pa. Com. Pl.* 1959) ; *Texaco, Inc. v. Williams*, 49 *Luz. L. Reg.* 265 (*Pa. Com. Pl.* 1959).

New Jersey's fair trade act was adopted in 1935. *L.* 1935, *c.* 58; *General Electric Co. v. Packard Bamberger & Co.*, 14 *N. J.* 209, 214 (1953). A statement attached to the bill, as introduced and passed without change, set forth that it was modeled after the California fair trade act which was enacted in 1931. That act had been passed during the depth of the depression years and had been sponsored mainly by retail trade associations. See Grether, "Experience in California with Fair Trade Legislation Restricting Price Cutting," 24 *Calif. L. Rev.* 640, 647 (1936) ; *cf.* Shulman, "The Fair Trade Acts," 49 *Yale L. J.* 607, 616 (1940) ; McAllister, "Price Control by Law in the United States," 4 *Law & Contemp. Prob.* 273, 296 (1937) ; 36 *Cornell L. Q.* 781, 791 (1951). The constitutionality of the New Jersey act was quickly brought into question. In *Johnson & Johnson v. Weissbard*, 120 *N. J. Eq.* 314 (*Ch.* 1936), Vice Chancellor Stein held that it was unconstitutional; he pointed out that the effect of the act was to enable private price fixing without public protection through governmental standards or supervisory provisions such as those embodied in the milk control act. See *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504 (*E. & A.* 1935). While an appeal from the Vice Chancellor's determination was pending, the United States Supreme Court handed down its opinion in *Old Dearborn Distributing Co. v. Seagram-Distillers Corp.*, 299 *U. S.* 183, 57 *S. Ct.* 139, 81 *L. Ed.* 109 (1936). There the court rejected the contention that the fair trade act of Illinois was unconstitutional under the Fourteenth Amendment. In his

opinion for the court, Justice Sutherland did not treat with the act as legislation designed to restrict price competition among retailers; instead he viewed it solely as legislation designed to protect the manufacturer's good will, as symbolized by its brand or trademark, against unfair price cutting by distributors. On this latter view, he found that the Legislature had not exceeded the bounds of its authority and had not infringed either the due process clause or the equal protection clause of the federal constitution. When the appeal from the Vice Chancellor's decision came before the Court of Errors and Appeals, it reversed on the basis of *Dearborn*, without any discussion whatever of state constitutional principles. *Johnson & Johnson v. Weissbard*, 121 *N. J. Eq.* 585 (*E. & A.* 1937).

For some time after *Dearborn* was decided, the fair trade acts were upheld in the various states with but rare exception. See *Liquor Store v. Continental Distillers Corp.*, 40 *So.* 2d 371 (*Fla. Sup. Ct.* 1949) ; 63 *Harv. L. Rev.* 546 (1950) ; 47 *Va. L. Rev.* 626, 631 (1961). However, in more recent days, many states have reconsidered the subject in the light of modern economic conditions and perhaps a broader understanding of the underlying forces. In *Bulova Watch Co. v. Zale Jewelry Co. of Cheyenne*, 371 *P.* 2d 409 (*Wyo.* 1962), the Wyoming Supreme Court collected the state cases which have passed on fair trade acts. It found a judicial trend against them and struck down the Wyoming fair trade act as "an improper delegation of legislative power, as offending the required due process protection, and as being beyond the police power of the State." 371 *P.* 2d, at *p.* 421. In *Union Carbide & Carbon Corp. v. Bargain Fair*, 167 *Ohio St.* 182, 147 *N. E.* 2d 481 (1958), the Supreme Court of Ohio found that the non-signer provision of its fair trade act was unreasonable, constituted an unauthorized exercise of the police power, and contravened the due process provision of the Ohio Bill of Rights. In the course of his opinion, Judge Zimmerman pointed out that although the earlier state court decisions upholding fair trade legislation rested entirely on

*Dearborn,* that case was not controlling insofar as state constitutional principles were concerned; and he referred to the fact that in recent years and in the light of present day conditions, courts have become more critical of fair trade ·acts ·and "have invalidated parts of them with increasing frequency." 147 *N. E. 2d,* at *p.* 483. See 27 *Fordham L. Rev.* 68 (1958); 69 *Yale L. J.* 168 (1959); 39 *Texas L. Rev.* 851 (1961); *cf.* Fulda, "Resale Price Maintenance," 21 *U. Chi. L. Rev.* 175, 206 (1954).

In *Lionel Corp. v. Grayson-Robinson Stores,* 15 *N. J.* 191, appeal dismissed 348 *U. S.* 859, 75 *S. Ct.* 87, 99 *L. Ed.* 677 (1954), the defendant made a renewed·constitutional attack on the New Jersey fair trade act under both the federal and state constitutions. Its attack was rejected in an opinion which expressed the view that the *Dearborn* case was still dispositive. See also *Burche Co. v. General Electric Company,* 382 *Pa.* 370, 115 *A. 2d* 361, 363 *(Sup. Ct.* 1955); *Kinsey Distilling Sales Co. v. Foremost Liquor Stores,* 15 *Ill. 2d* 182, 154 *N. E. 2d* 290, 294 *(Sup. Ct.* 1958); but *cf.* Conant, "Resale Price Maintenance: Constitutionality of Non-Signer Clauses," 109 *U. Pa. L. Rev.* 539, 546 (1961). In his concurring opinion in *Lionel,* Justice Heher stated that there was now reason to believe that fair trade was being used by distributors "as a device to stifle price competition, in the name of protection to the producer's property right in his trade-mark." He found the record before him insufficient to deny the relief sought by the plaintiff but suggested that the time had perhaps come for :"a legislative reassessment of the policy in the context of prevailing trade practices and concepts and the teachings of experience." 15 *N. J.,* at *p.* 202. In the case at hand, the parties have not questioned the suitability, under existing economic and trade conditions, of branded gasoline as a subject of fair trade (*cf. Gulf Oil Corporation v. Mays,* 401 *Pa.* 413, 164 *A. 2d* 656 *(Sup. Ct.* 1960); 109 *U. Pa. L. Rev.* 617, 622 (1961)); nor have they questioned the continued validity of New Jersey's fair trade legislation; nevertheless the exceptional history and nature

of the legislation have been detailed as pointing to the special need for judicial scrutiny of enforcement proceedings to insure that there be no perversion of the stated legislative purpose and that there be full adherence to basic equitable principles. See *Gillette Co. v. Two Guys from Harrison, Inc.,* 36 *N. J.* 342, 349 (1962); *U. S. Time Corp. v. Grand Union Co.,* 64 *N. J. Super.* 39, 47 (*Ch. Div.* 1960); *Frank Fischer, &c., Corp. v. Ritz Drug Co.,* 129 *N. J. Eq.* 105, 108 (*Ch.* 1941); *Lentheric, Inc. v. Weissbard,* 122 *N. J. Eq.* 573, 575 (*Ch.* 1937). See also *Pazen v. Silver Rod Stores, Inc.,* 130 *N. J. Eq.* 407, 412 (*E. & A.* 1941); *Gulf Oil Corporation v. Mays, supra,* 164 *A.* 2*d,* at *pp.* 659–661.

In *Frank Fischer, &c., Corp. v. Ritz Drug Co., supra,* the plaintiff sought an injunction pursuant to the fair trade act. In denying relief, the court found that the plaintiff had failed to give wide enough notice to retailers to support an enforceable uniform minimum resale price. In the course of its opinion it approvingly cited *Calvert Distillers Corp. v. Nussbaum Liquor Store,* 166 *Misc.* 342, 2 *N. Y. S.* 2*d* 320 (*Sup. Ct.* 1938), where Justice Shientag pointed to the fact that the fair trade act itself contained broad general terms without protective administrative safeguards and that it was incumbent upon the courts, in construing and enforcing it, to apply such equitable principles as were suitable to the nature and purpose of the law. He listed various elements which he considered implicit in the law including a requirement that the "prices fixed for resale by retailers be uniform in any one competitive area." 2 *N. Y. S.* 2*d,* at *p.* 325. Along the same lines, Vice Chancellor Stein in the *Fischer* case first noted that the Court of Chancery had applied equitable principles in the construction of the statute, and then had this to say:

"A manufacturer or such other person entitled to operate under the statute must subject all retailers selling his commodity to restrictions which are uniform, otherwise he permits discrimination between classes of consumers and classes of retailers. Except as the legislature itself may constitutionally provide, the fixed price must apply to

all consumers alike and this can be accomplished only by binding all retailers to maintain the same minimum price schedule. A manufacturer may not require or permit one group of retailers to sell at a fixed price leaving another group selling the same product free to pursue its own price policy. Similarly the manufacturer may not, except as permitted by statute (see 1940 amendment exempting libraries) set a different price for classes of consumers. The very description of the statute as a Fair Trade Act carries with it the fundamental equitable concept that 'equality is equity.' Exemptions from price restriction cannot be left to the sole uncontrolled, arbitrary act of the manufacturer." 129 *N. J. Eq.*, at *pp.* 108–109.

In *U. S. Time Corp. v. Grand Union Co.*, *supra,* the court stated that the fair trade act carries with it the fundamental equitable concept that he who seeks equity must do equity and that the producer must "refrain from causing any unjust discrimination among the retail dealers" and must not permit or tolerate "the practice of price-cutting by retailers." 64 *N. J. Super.*, at *p.* 47. In *Gillette Co. v. Two Guys from Harrison, Inc.*, *supra,* the court gave recognition to the fact that although the statute was designed primarily to protect the producer's trademark it was also intended to afford protection to the retailer and the consuming public. *Cf. U. S. Time Corp. v. Grand Union Co.*, *supra,* 64 *N. J. Super.*, at *p.* 49. In the course of his opinion in *Gillette,* Justice Haneman pointed out that if a producer markets fair traded articles in combination, it must do so in such manner as not to pervert "the principles of fair trade legislation" and as to give recognition to the "interests of the public and retailers." 36 *N. J.*, at *p.* 349.

We come now specifically to the effect of the plaintiff's 1958 exclusion of commercial accounts from the scope of its fair trade agreement. In *Burroughs Wellcome & Co. v. Weissbard,* 129 *N. J. Eq.* 563, 564 (*Ch.* 1941), aff'd, 130 *N. J. Eq.* 605 (*E. & A.* 1942), the court held that an exemption from the fair traded prices of pharmaceutical products in favor of "physicians, dentists, veterinarians, clinics, hospitals and charitable institutions" did not impair the plaintiff's right to relief. In his brief reference to the matter, Vice Chancellor Egan remarked that the prices fixed were uniform, that the exemption was available to all retailers, and that he

saw no objection to it. Mr. Callmann indicates that well-defined and high-minded exemptions "for public service purposes" are common. 1 *Callmann, Unfair Competition in Trade-Marks* 496 (2d ed. 1950). In *Burroughs Wellcome & Co. v. Johnson W. Perfume Co.*, 128 *Conn.* 596, 24 *A.* 2d 841, 845 (*Sup. Ct. Err.* 1942), the court, while upholding such an exemption as reasonable, suggested that other exemptions might well be unreasonable or might "be made so generally or under such indefinite terms" that they would destroy the validity of the fair trade schedule. 24 *A.* 2d, at *p.* 845. We believe that to be the case here. See *Bermingham, supra*, 7 *U. C. L. A. L. Rev.*, at *p.* 257, where Mr. Bermingham, counsel for the General Petroleum Corporation, questioned the effectiveness of gasoline fair trade programs in which producers have sought to exempt commercial accounts in their effort to "avoid the reefs of *McKesson & Robbins* and *Secatore*" (7 *U. C. L. A. L. Rev.*, at *p.* 256); as he put it:

"* * * the exclusion of commercial sales leaves the door open for any retailer who wants to cut the stipulated price. He can presumably classify any employee of a business establishment as a commercial buyer, and because policing of thousands of dealers is impossible, he has little fear of his classification being challenged." 7 *U. C. L. A. L. Rev.*, at *p.* 257.

The 1958 exemption has no certain or well-defined meaning. This would appear from the nature of the language itself and was made further evident by the comments of counsel for the plaintiff in the Chancery Division. Thus he left much to the discretion and judgment of the individual dealer and supposed that, under certain circumstances, the owner of a single truck could properly be viewed by the dealer as a commercial concern and served at the gasoline station at prices below the fixed minimum resale prices. That being so, there would seem to be no reason why an ordinary passenger car used in connection with a business could not be viewed as meeting the terms of the exemption; and perhaps, as Mr. Bermingham suggests (7 *U. C. L. A. L. Rev.*,

at *p.* 257), an employee of the business might also qualify. The obstacles to obtaining uniformity of application and enforcement would appear insurmountable and the effect upon retailers might well be disastrous. Under *N. J. S. A.* 56 :6–2.1 *et seq.* retailers are obliged to post their prices and their posting of fair trade prices along with lesser prices for commercial concerns would lead to interminable confusion and difficulty. In particular instances, the quantities purchased by individual owners of passenger vehicles might well exceed the quantities purchased by business concerns; despite that fact, the purchases by the individuals would be controlled by the minimum prices while the purchases by the business concerns would not. This could hardly be viewed as fair or reasonable or as furthering the legitimate purpose of the law. Upholding the fair trade agreement with its stated exemption would not serve to advance the protection of the good will symbolized by the producer's brand or trademark, nor would it afford an appropriate measure of protection to the retailers and the public. *Cf. Gillette Co. v. Two Guys from Harrison, Inc., supra,* 36 *N. J.,* at *p.* 349; *Frank Fischer, &c., Corp. v. Ritz Drug Co., supra,* 129 *N. J. Eq.,* at *pp.* 108–109.

Affirmed, with direction that the default judgment entered in the Chancery Division be vacated.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.