**CHAMPION SPARK PLUG COMPANY,**
a body corporate of the State of
Delaware,

v.

**T. G. STORES, INC., a body corporate of
the State of Maryland.**

**Civ. A. No. 14605.**

United States District Court
D. Maryland.

March 24, 1965.

---

Jesse Slingluff and Morton P. Fisher, Jr., Piper & Marbury, Baltimore, Md., for plaintiff.

A. David Gomborov, Silbert & Gomborov, Baltimore, Md., for defendant.

R. DORSEY WATKINS, District Judge.

This is an action brought by Champion Spark Plug Company (Champion) against T. G. Stores, Inc. (T. G.) for alleged violation of the Maryland Fair Trade Act, Maryland Code of Public General Laws, Article 83, section 107, 1957 Edition, by wilfully and knowingly advertising, offering for sale and selling fair traded articles manufactured by plaintiff at below the established fair trade prices. Defendant initially filed a motion to dismiss which was denied without prejudice. Following this denial, defendant filed an answer to the complaint putting in issue all, or substantially all, defenses which competent counsel are accustomed, even if only for the record, to interpose in such cases. These included, inter alia, a denial that the requisite jurisdictional amount was in controversy; that articles manufactured and distributed by the plaintiff were in free and open competition with articles of the same class manufactured and sold by others; that irreparable injury to plaintiff's existing and prospective business had resulted or would result from defendant's actions; that plaintiff's standard form of fair trade agreement was in conformity with the law, said form allegedly being discriminatory and unreasonably arbitrary as to certain price categories established therein; and that plaintiff had exercised reasonable

diligence in enforcing its fair trade contracts and had not abandoned its fair trade policies, the latter denial being based on the fact that trading stamps allegedly were being given with the purchase of plaintiff's products with plaintiff's knowledge and consent.

At a pretrial conference the defendant indicated in addition that it was raising the so-called "Eli Lilly" defense, that is the issue of whether or not the plaintiff is carrying on an intrastate business in Maryland without having qualified to do such business herein as required by Maryland law (Eli Lilly & Company v. Save-On-Drugs, Inc., 1961, 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288). This defense had previously been raised in the motion to dismiss and ruled on adversely to defendant without prejudice to its renewal at the trial of the case.

During trial defendant submitted evidence on the issue of non-enforcement and cross-examined plaintiff's witnesses with respect to the issues of non-enforcement, availability of competitive products, irreparable injury, price discrimination and whether or not the plaintiff transacts intrastate business ·in Maryland. After trial the defendant was given the opportunity to file a memorandum of law. Apparently conceding all other points to be unsubstantiated, defendant briefed only two issues in its memorandum; first the "Eli Lilly" defense, and secondly estoppel of plaintiff from enforcing its fair trade agreements because it had created therein certain arbitrary price discriminations. Plaintiff requested that the case be reopened to permit it to produce a witness who was qualified to testify with regard to the making of, and the reasons for, the alleged discriminatory classifications contained in Champion's current fair trade contracts. This request was granted and the case was reopened for the taking of further testimony. Subsequently, at oral argument defendant again urged but two defenses, apparently abandoning all other points (Transcript of oral argument, page 18). Accordingly, the court will consider in turn the two remaining defenses urged by defendant.

## The Eli Lilly Defense.

Defendant contends that plaintiff is barred from maintaining this suit by Article 23, section 91(c) of the Maryland Code of Public General Laws, 1957 Edition, on the ground that plaintiff is engaged in intrastate business within the State of Maryland without having qualified to do such business as required by Article 23, section 90(f).

Article 23, section 91(c), incorporating by reference the requirements of section 90 states:

"No suit shall be maintained in any court of this State by any such foreign corporation or by anyone claiming under such foreign corporation if such foreign corporation is doing or has done intrastate or interstate or foreign business in this State without having complied with the requirements of § 90 of this article * * *."

Section 90 referred to in the statute above provides, inter alia, that a foreign corporation which has complied with certain subsections of section 90 will be deemed to be registered to do interstate and foreign business within the state and that a foreign corporation upon compliance in addition with another specified subsection will be deemed to be qualified to do intrastate business within the state. The plaintiff does not contend that it is not doing business within the state but it does contend it is doing purely interstate business. It has registered to do interstate business but has not qualified to do intrastate business. The sole issue before this court as to this particular defense is whether or not the plaintiff is conducting an intrastate as well as an interstate business within the State of Maryland.

The facts are not in dispute and are as follows:

"Plaintiff has no property, warehouses or offices in the State, nor does it maintain a listing in any telephone directory in any city or

town in Maryland. Plaintiff has six employees who reside in and work in the State of Maryland; two of these employees work part time in the District of Columbia and certain sections of Virginia and West Virginia as well. Champion representatives operate from their own homes, are paid on a salary basis and meet their own office expenses. There are no office personnel paid by plaintiff in Maryland. Plaintiff reimburses its employees for all of their expenses incurred while on the road, reimburses them for all long distance business telephone calls, supplies them with automobiles leased at plaintiff's expense and reimburses them for sums expended for gasoline and necessary repairs. No State withholding taxes are withheld from the Champion representatives' wages.

"Champion sells the automotive spark plugs which it manufacturers under its trademark 'Champion' in interstate commerce to only twelve specified distributors (wholesalers) in the State of Maryland. Champion does not sell to any other wholesalers, any retailers or any ultimate consumer. The distributors submit purchase orders directly to Champion at its principal office in Toledo, Ohio, all of which orders are subject to acceptance at Champion's principal office. Accepted orders are filled by Champion by delivery of its products to the distributors from plants operated by Champion outside of the State of Maryland. Plaintiff's representatives never deliver goods, even in an emergency, and have no discretion in negotiating prices. They never attempt to collect accounts.

Champion's twelve Maryland distributors in turn sell the plugs which they have purchased from Champion to Maryland jobbers of which there are one hundred or two hundred in the State. The distributors in addition sell, as to the jobbers, to local car dealers, garages, service stations and other retailers, which sell finally to the ultimate consumer.

Champion has two different sales forces. It has field representatives whose primary function is to call upon the dealers, service stations and garages, i. e. the retailers, to acquaint them with the products of the plaintiff with a view to encouraging the use of these products. The second type of sales force is the territory representatives who call on the jobbers and on the twelve distributors, Champion selling direct only to said distributors. The representatives, field or territorial, have no authority either to accept an order from the various dealers, service stations, garages and jobbers on behalf of the distributors or to accept an order from the distributors on behalf of Champion.

The representatives calling on the outlets other than the distributors go to such outlets with the basic purpose of gaining acceptance for Champion's line of spark plugs with the dealer and also with the consuming public. (Transcript of testimony of H. Gordon Straub, Assistant Sales Manager for Champion Spark Plugs, page 16). Their purpose is the advancing of the sales of Champion Spark Plugs (ibid, page 18).

To effectuate this purpose Champion's representatives engage in the following types of activities: They examine the stock and the inventory of the automotive parts establishments, auto repair shops, gasoline stations, etc. upon which they are calling. They make recommendations concerning stock and inventory —which items to drop, which to order instead, which to reorder. They advise concerning kinds and quantities of spark plugs, make out a stock check list and order sheet. (Transcript of testimony of Robert H. Sherman, Representative for Champion Spark Plug, pages 25, 26

and 27). The representatives transmit, as a convenience and service to the retailer, the Maryland retailer's order to the Maryland distributor (the wholesaler) either by phoning the order in or by taking it to the distributor's place of business. The representatives place point-of-sale advertising at the retail outlets. One Champion employee is made available to provide free technical or repair service. This employee has a panel truck with tune-up equipment including a test engine. His work is that of an engineer involved in solving the problems that may arise out of incorrectly used plugs or defective plugs. He does at times provide test plugs where a particular problem has arisen. These are supplied at no charge and the engineer will check back to see if the test plug is the proper plug to work on the particular piece of equipment involved. His services are known by the customers to be available by calling another employee of Champion. The service man spends approximately forty working days a year within the State. Champion's men in Maryland monitor Champion's fair trade price system, warn those who are in violation of the existing price list and report violators to the home office in Toledo, Ohio.

It is to these undisputed facts that the controlling principles announced in Eli Lilly & Company v. Sav-On Drugs, Inc., 1961, 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288, and in G. E. M., Inc. v. Plough, Inc., 1962, 228 Md. 484, 180 A.2d 478, must be applied. In the Eli Lilly case, although the New Jersey statute therein involved purported to subject a foreign corporation to registration when it was found to be "transacting any business" in the state, the Supreme Court held that the "trial Court interpreted the phrase 'transacting business' in the New Jersey statute to mean transacting local intrastate business and concluded from the facts it found that Lilly was

transacting such business." (366 U.S. 276, 283, 81 S.Ct. 1316, 1321.) In addition the Supreme Court clearly considered, and so stated, the problem before it to be "whether Lilly is engaged in intrastate commerce in New Jersey" (366 U.S. 276, 279, 81 S.Ct. 1316, 1318). Thus the Lilly case is specifically concerned with what constitutes the doing of intrastate business, not, as plaintiff contends, with what constitutes the doing of interstate business or "transacting any business." On startlingly similar facts to the ones found in the instant case by this court, the Supreme Court held that the uncontroverted evidence clearly showed that Lilly was "conducting an intrastate, as well as an interstate business in New Jersey" (366 U.S. 276, 279, 81 S.Ct. 1316, 1319). In detailing the nature of Lilly's intrastate activities the Supreme Court said:

"* * * These eighteen 'detailmen' have been traveling throughout the State of New Jersey promoting. the sales of Lilly's products, not to the wholesalers, Lilly's interstate customers, but to the physicians, hospitals and retailers who buy those products in intrastate commerce from the wholesalers. To this end, they have provided these hospitals, physicians and retailers with up-to-date knowledge of Lilly's products and with free advertising and promotional material designed to encourage the general public to make more intrastate purchases of Lilly's products. And they sometimes even directly participate in the intrastate sales themselves by transmitting orders from the hospitals, physicians and drugstores they service to the New Jersey wholesalers."

In the instant case Champion's intrastate activities are identical with Lilly's in New Jersey, with one exception. Lilly did have its name on an office door in New Jersey and was listed in the telephone directory in the regular section and in the classified section. The court does not find this factual difference between the cases a sufficient basis for dis-

tinction, since the Supreme Court in Eli Lilly made it clear that the significant factor was whether or not the foreign corporation was engaged in the domestic business of inducing one local merchant to buy a particular class of goods from another local merchant. The court held that "the record shows that Lilly here, * * * engages in a 'domestic business—inducing,' * * * 'one local merchant to buy a particular class of goods from another.' The fact that the business of 'inducing' intrastate sales, as engaged in by Lilly is primarily a promotional and service business which does not include a systematic solicitation of orders goes only to the nature of the intrastate business Lilly is carrying on, not to the question of whether it is carrying on an intrastate business." (Eli Lilly & Co. v. Sav-On-Drugs, 1961, 366 U.S. 276, 282, 81 S.Ct. 1316, 1320.) On the record before this court Champion is clearly engaged in promoting intrastates sales, that is sales from Maryland wholesalers (Champion's twelve distributors) to Maryland retailers (the automotive parts establishments, auto repair shops, gasoline stations, etc. selling Champion products to the ultimate consumer). Champion's employees "even directly participate in the intrastate sales themselves by transmitting orders from the" retail outlets that "they service" to the wholesalers, the twelve distributors within Maryland.

■ Plaintiff's reliance on G. E. M. v. Plough, Inc., 1962, 228 Md. 484, 180 A.2d 478 is misplaced. The plaintiff urges that although the record does not fully outline all of the activities of the Plough salesman it is complete enough to indicate that their mode of operation was remarkedly similar to that of Champion field representatives. In fact, it was materially different. In the Plough case, the Court of Appeals of Maryland found that the foreign corporation had two distinct sales forces, one known as the wholesale sales force and the other known as the retail sales force and that Plough products flowed into Maryland "by *sales* in *interstate* commerce * * * direct to Maryland wholesalers, chain stores, and retailers." (228 Md. 484, 486, 180 A.2d 480; emphasis supplied). Thus the promotional activities of Plough's wholesale sales force were directed to the inducing of *interstate* sales from Plough to the Maryland wholesalers while the promotional activities of Plough's retail sales force were directed to the inducing of *interstate* sales from Plough to the local retailers. The one significant factor in the Eli Lilly case which convinced the Supreme Court that Eli Lilly was engaged in "domestic business" was completely absent in the Plough case, and the Maryland Court of Appeals specifically so noted saying that the Plough salesman "engage in no promotion of intrastate sales, i. e., sales from Maryland wholesalers to Maryland retailers." (G. E. M., Inc. v. Plough, Inc., 1962, 228 Md. 484, 487, 180 A.2d 478, 480.) It is just this type of activity, lacking in the Plough case, which is involved in the instant case and just this type of activity which led the Supreme Court in the Eli Lilly case to conclude that the foreign corporation was engaged in intrastate business. Accordingly, the court concludes that plaintiff had been and is engaged in intrastate business within the state of Maryland without having complied with the requirements of section 90 of Article 23 and is therefore barred from maintaining this suit by the provisions of section 91(c) of Article 23.

This conclusion would appear to be dispositive of the present suit. However, as an appeal and a reversal on this issue are always possibilities; and in any event this failure could readily be neutralized by qualification to do intrastate business, the court, to avoid piecemeal litigation, will proceed to rule on the other issue remaining in the case as to which substantial testimony and evidence were offered and argument had; and which is an equally, or perhaps more, adequate defense.

*Plaintiff's Establishment of "Fleet Operator" Categories and Price Treatment Thereof.*

As a second affirmative defense defendant contends that plaintiff is estopped from enforcing its fair trade agreements by arbitrary price discrimination between "A" fleet operators, "B" fleet operators and consumers; and by its arbitrary exclusion of "C" fleet operators from said agreements. The evidence shows that in 1961 the plaintiff had established minimum resale prices from its distributors (wholesalers) to four different classes of purchasers and had completely exempted one class as follows:

1. Dealers (retailers)—

   67¢ per unit (i. e., per single plug) on purchases of less than ten.

   63¢ per unit on purchases of ten or more.

2. "A" fleet operators ("The term 'fleet operator' refers to an account which has a suitably equipped work shop having facilities for the repair and maintenance of motor vehicles and engines, and employing at least one qualified mechanic devoting his full time to servicing and repairing its vehicles and engines. The term "A" fleet operator refers to a fleet operator having less than fifty vehicles").[1]

   67¢ per unit (i. e., per single plug) on purchases of less than ten.

   63¢ per unit on purchases of ten or more.

3. "B" fleet operators. ("The term 'fleet operator' refers to an account which has a suitably equipped work shop having facilities for the repair and maintenance of motor vehicles and engines, and employing at least one qualified mechanic devoting his full time to servicing and repairing its vehicles and engines. * * * The term 'B' operator refers to a fleet operator having 50 to 199 vehicles").[2]

   55¢ per unit.

4. Purchasers on the "C" fleet basis.[3]

   No minimum fair trade price. "C" fleet purchasers exempt from agreement.

5. consumers.

   $1.08 a unit.

Thus the minimum resale prices to these various classes of purchasers differed substantially. To the dealers and "A" fleet operators the price per spark plug or unit was 63¢ when ten or more plugs were purchased and 67¢ when less than ten were purchased. To "B" fleet operators the price was 55¢ per unit. Those purchasing on a "C" fleet basis were completely exempt from the minimum resale prices established by the fair trade agreements but testimony showed that the actual price to the "C" fleet operator was 48¢ per unit. To the consumer public the price was $1.08 per spark plug. What constituted a "Fleet operator" was defined, as well as what constituted the specific class of "A", "B" or "C".

In 1963 plaintiff changed its own definition of a fleet operator. The requirements of a suitably equipped work shop, facilities for the repair and maintenance, and the full time employment of at least one qualified mechanic were all deleted

1. Plaintiff's Reseller Fair Trade Agreement dated November 6, 1961, page 1, paragraph 1 and page 2, paragraph 1; plaintiff's Exhibit No. 2.

2. Plaintiff's Reseller Fair Trade Agreement dated November 6, 1961, page 1, paragraph 1 and page 2, paragraph 1; plaintiff's Exhibit No. 2.

3. Plaintiff's Reseller Fair Trade agreement dated November 6, 1961, page 1, paragraph 1, plaintiff's Exhibit No. 2 provides "the term 'fleet operator' as used in this agreement shall not include any purchaser who buys on the 'C' Fleet Basis. The term 'fleet operator' refers to an account which has a suitably equipped work shop having facilities for the repair and maintenance of motor vehicles and engines, and employing at least one qualified mechanic devoting his full time to servicing and repairing its vehicles and engines". Plaintiff's witnesses further orally defined a "C" fleet operator as one having two hundred or more vehicles.

from the contract. Plaintiff's fair trade agreements now provide:

"The term 'Fleet Operator' refers to the operator of a fleet of motor vehicles purchasing spark plugs for the use in its own equipment only and not for resale. The term 'A' fleet operator refers to a fleet operator having less than twenty vehicles at one or more locations. The term 'B' fleet operator refers to a fleet operator having twenty to ninety-nine vehicles at one or more locations."

The agreements also provide:

"The term 'Fleet Operator' as used in this agreement shall not include any purchaser who buys on the 'C' fleet basis."

Thus the purchaser on a "C" fleet basis is completely excluded from the operation of the minimum resale prices set by plaintiff's fair trade agreements. No definition of "C" fleet basis is given in the fair trade agreements themselves but in a "suggested" price list covering "C" fleet operators such operators are defined as any fleet operator having one hundred or more vehicles at one or more locations purchasing spark plugs for use in its own equipment only and not for resale. The minimum resale prices established are now as follows:

1. Dealers (retailers)—

    67¢ per unit on purchases of less than ten.

    63¢ per unit on purchases of ten or more.

2. "A" fleet operators (A fleet operator purchasing for use in his equipment only and not for resale who has less than twenty vehicles at one or more locations).

    67¢ per unit on purchases less than ten.

    63¢ per unit on purchases of ten or more.

3. "B" fleet operators (A fleet operator purchasing for use in his equipment only and not for resale who

has twenty to ninety-nine vehicles at one or more locations).

    55¢ each.

4. "C" fleet operators (A fleet operator purchasing for use in his equipment only and not for resale who has a fleet of one hundred or more motor vehicles at one or more locations).

    No minimum Fair Trade price.

    48¢ per unit suggested by Champion.

5. Ordinary consumers $1.08 each.

Testimony elicited from plaintiff's witnesses further showed that the price differential established among the various classes specified above was not related to the cost of distribution. There is no difference in the cost of handling a box of ten plugs whether it goes to a dealer, an "A" fleet operator, a "B" fleet operator, a "C" fleet operator or the ordinary ultimate consumer. It is not more expensive or less expensive to handle the sale of one plug depending upon which of the five classes, designated by plaintiff, is the purchaser. What is more expensive is the cost of handling the sale of one plug or a few plugs as contrasted with quantity sales. This differential in cost is not reflected by plaintiff's price categories where, as plaintiff's witnesses testified, a "C" fleet operator may buy one plug for 48¢, a "B" fleet operator may buy two plugs for 55¢ each and an "A" fleet operator may purchase eight plugs for each of his nineteen vehicles, or 152 plugs for 63¢ each. That this is not purely hypothetical and that situations actually exist where the purchaser paying the higher unit price is the quantity purchaser is evidenced by the testimony of Mr. Robert H. Sherman, Champion's territory representative in the State of Maryland:

"Q   Whereas a little man, who has 49 pieces of equipment may be running 49 of them on your plugs only, and would buy many, many times what that man with 50 pieces buys.

"A   This is possible.

"Q Therefore, there is actually no basis for the discrimination in the price between a man purchasing 10, whether he has 50 pieces, or 10 if he has 49, is that correct?

"A That is correct.

"Q Now, you have many dealers that sell more plugs than the 'B' operators, don't you?

"A Yes.

"Q Well, why aren't they given the .55 price?

"A Because the price schedule states .63." (Transcript of original trial, page 55).

The evidence also shows that plaintiff's distributors compete with the retailers in that the distributors sell not only to dealers and to fleet operators but also to the consumer public. When the distributor sells at retail he receives a second profit, (1) the difference between the cost to the distributor and the price to the dealer and (2) the difference between the cost to the dealer and the price to the consumer public.

Plaintiff's price differentials are not related to the cost of production or to the cost of distribution except as rather roughly estimated on the basis that at least as between the various fleet operators and the ordinary public consumer the more vehicles one owns the larger "potential", as distinguished from "actual", purchaser one is. Plaintiff's witnesses could not explain why an "A" fleet operator is distinguished from a "B" operator by the magic number of twenty vehicles, why a "B" fleet operator is distinguished from a "C" fleet operator by the magic number of one-hundred vehicles, nor why prior to 1963 these distinctions were made at the magic numbers of fifty vehicles as between "A" and "B" and two hundred vehicles as between "B" and "C".

The applicable law is succinctly stated in *Texas Company v. Di Gaetano*, 1963, 39 N.J. 120, 187 A.2d 721, 727:

"* * * Mr. Callmann indicates that well-defined and high-minded exemptions 'for public service purposes' are common. 1 Callmann, Unfair Competition in Trade-Marks 496 (2d ed. 1950). In Burroughs Wellcome & Co. v. Johnson W. Perfume Co., 128 Conn. 596, 24 A.2d 841, 845 (Sup.Ct.Err.1942), the court, while upholding such an exemption as reasonable, suggested that other exemptions might well be reasonable or might 'be made so generally or under such indefinite terms' that they would destroy the validity of the fair trade schedule."

In the Di Gaetano case the Texas Company adopted a resale price fixing program pursuant to New Jersey's Fair Trade Act. In 1956 Texaco advised its retail dealers that its minimum prices did not apply to sales "to purchasers to whom delivery is made by tankwagon or truck transport into bulk storage facilities maintained by such purchasers". In 1958 Texaco amended its fair trade agreements to provide that its minimum retail prices should not apply to sales made, inter alia, "to commercial or industrial concerns or institutional establishments." The court found from the language of the exemption itself and from comments made by the counsel for plaintiff that the 1958 exemption had no certain or well-defined meaning; that much was left to the discretion or the judgment of the individual retailer to determine whether a purchaser came within the exemption or not; and that in:

"particular instances, the quantities purchased by individual owners of passenger vehicles might well exceed the quantities purchased by business concerns; despite that fact, the purchases by the individuals would be controlled by the minimum prices while the purchases by the business concerns would not. This could hardly be viewed as fair or reasonable or as furthering the legitimate purpose of the law. Upholding the fair trade agreement with its stated exemption would not serve to advance the protection of the good will symbolized by the producer's

brand or trademark, nor would it afford an appropriate measure of protection to the retailers and the public." (The Texas Company v. Di Gaetano, 1963, 39 N.J. 120, 187 A.2d 721, 727)."

So viewing the exemption the court held that the plaintiff was barred from enforcing its minimum resale prices against the defendant retailer.

The classifications carved out by Champion in its minimum fair trade price lists are no less subject to attack than the one before the court in the Di Gaetano case. The "C" fleet operators, by reason of their size alone, and without regard to the number of plugs actually purchased, at one time or over any period of time, may purchase spark plugs at competitive prices without any regard to fair trade prices established by plaintiff, and since January 1, 1963 the equipment size requirement itself has been reduced arbitrarily by Champion by fifty per cent from the requirement of having two hundred vehicles to having one hundred vehicles in order to qualify as a "C" fleet operator. Such an operator even at plaintiff's "suggested price" level is permitted to buy plugs at 60¢ below the price charged to the consumer public of $1.08 per unit. This is true whether the "C" fleet operator buys one or several spark plugs, and it makes no difference that members of the public at large or that the dealer-retailers or that the "A" fleet operators or that the "B" fleet operators may in fact buy at one time, or over any particular period, more spark plugs than the "C" fleet operator. Plaintiff's witness spoke of so-called fleet operators as "wholesalers"; this although by plaintiff's own current definition they must be purchasers for their own use "and not for resale", in other words—ultimate consumers. Plaintiff submitted no evidence that its price differentials in its fair trade agreement and that its exemption of "C" fleet operators therefrom were based on any difference in cost of production, shipment, handling or any other realistic difference in cost. They are certainly not of the class of "high-minded exemptions for public service purposes" referred to by Callmann both as prevalent and reasonable.

However, even were the complete exemption of "C" fleet operators and the difference in treatment of the other purchasers held not to be unreasonable for failure to be based on any realistic difference in cost to plaintiff, these classifications would still be subject to attack on the ground that the "fleet operator" category and subdivisions thereof, provided for by plaintiff in its fair trade contracts is so ill-defined and uncertain a category as to preclude enforcement of plaintiff's contract. First, the term "fleet operator" carries no clear cut definition by and of itself. Had the term an inherent meaning plaintiff would not have required two hearings and the taking of much testimony to endeavor to establish just what is meant by "fleet operator." Nor would it have been necessary for plaintiff specifically to define a "fleet operator" in its 1961 "Reseller Fair Trade Agreement" as "an account which has a suitably equipped work shop, having facilities for the repair and maintenance of motor vehicles and engines, and employing at least one qualified mechanic devoting his full time to servicing and repairing its vehicles and engines", and then to change completely the definition in its fair trade agreement of 1963 to characterize a fleet operator as "the operator of a fleet of motor vehicles purchasing spark plugs for use in its own equipment only and not for resale."

Secondly, even plaintiff claims only that the term has a meaning in the trade. At no time was it claimed nor did the evidence show that "fleet operator" has a meaning outside the automotive trade or that a retailer such as the defendant, a large discount house dealing in all conceivable types of merchandise, is a member of the automotive trade or industry. Indeed, the exact opposite was asserted by plaintiff's witnesses—that the defendant did not have the necessary expertise to identify a fleet operator. Plaintiff's witnesses testified that "fleet operators" are a recognized, industry

wide segment of the automotive industry and that the term "fleet operator" has a special meaning and application in the automotive trade. Champion urged that the automotive industry as a whole affords fleet operators a special status and special treatment, and that the term "fleet" has a meaning in the trade as is evidenced by the fact that there are fleet magazines and fleet conventions. In two memoranda submitted after trial by the plaintiff fairly and frankly summarizing this testimony, reference is made by plaintiff throughout to the special meaning and application of the term fleet operator "in the automotive trade", in the "automotive industry as a whole" and to knowledge of that meaning and special application by salesmen who service the industry and "are specialists in their field", knowledge by "automotive distributors and jobbers" and knowledge "by all people in the automotive industry". However, plaintiff's witnesses did not charge defendant with knowledge of the special meaning and special application of the term "fleet operator" for which plaintiff contends. Indeed, Champion's assistant sales manager maintained that basically only automotive distributors (of which Champion has twelve in the State of Maryland) and jobbers (who in turn sell to dealers or retailers such as defendant) were qualified to distinguish between fleet operators and other ultimate consumers. In explaining the distinction between the two he stated that a consumer is different from a fleet operator:

"A Because he is not a recognized fleet; he is a consumer.

"Q Who does the recognizing?

"A *Your particular store is not engaged in the business of wholesaling, are you?*
*Aren't you a retailer?*

\* \* \* \* \*

"Q What I am trying to find out is, and this is actually who is going to determine whether a man is a fleet operator or not.

"A Well, I think, *basically, our automotive distributors and jobbers will define them in the course of doing business with them.*

"Q On your fair trade contract, you don't make any limitation as to, or *you don't describe what is a fleet operator,* is that correct?

"A I don't believe we do, except where we state that the plugs are not going to be resold and are going to be used in their vehicles.

"Q That is what the ultimate consumer does too." (Transcript of supplemental hearing, page 41, page 43; emphasis supplied.)

Thus from the evidence submitted by plaintiff itself it clearly appears that plaintiff, in carving out in its fair trade contracts certain distinctions between, and a total exemption of, certain of its customers, has even under its own theory used a term of art unknown to defendant and incapable of being applied by defendant,[4] yet nevertheless binding on the defendant, a non-signer and a stran-

---

4. Plaintiff attempted to argue in effect that defendant has no standing to attack plaintiff's fair trade contracts because the possibility of defendant, a retailer, selling at fleet operator price levels is a hypothetical situation and that, therefore, defendant would never be required to attempt to distinguish between a fleet operator and any other ultimate consumer. This argument is without merit. First, defendant could sell at a loss. Loss leaders are not unknown in defendant's field of merchandising. Secondly, defendant could profitably sell at more than the minimum price established for fleet operators but less than the minimum price established for the so-called "consumer" category. Thirdly, and most significantly, the shoppings made by plaintiff in the instant case, which formed the basis of plaintiff's charge that defendant is violating plaintiff's fair trade agreements, show sales made at 66¢ a unit for four spark plugs, a price below the minimum established by plaintiff for "A" fleet operators.

ger to the contract employing the esoteric term.[5] Nevertheless, plaintiff wants defendant enjoined, and placed in jeopardy of contempt, for violation of the terms of an agreement plaintiff says defendant is not fitted to understand, obey and apply. Under such circumstances, the exemption or classifications established by plaintiff clearly cannot be said to be reasonable and therefore they bar the plaintiff from enforcing its fair trade contract against defendant.

Additionally it should be noted that plaintiff, although claiming that the term "fleet operator" is well-known in the "trade", has really made no showing that "fleet operator" actually has an established, well defined, meaning even in the trade. Plaintiff's own employees were not consistent in their testimony as to what they understood a fleet operation to be. Mr. Posner, a Champion field representative, first stated that a man owning fifty vehicles could not buy as a "B" fleet operator unless he had his own garage and his own mechanic to do his repair work (Transcript, page 99). Upon being shown Champion's 1963 price sheet he then changed his testimony and said that doing one's own maintenance and repair work was not the test of a "B" fleet operator (Transcript, page 100). He had earlier stated that having a workshop or mechanic or a part time mechanic was not a necessary characteristic of an "A" fleet operator. He further testified that a "C" fleet operator to get the advantage of his total exemption from plaintiff's fair trade program would have to purchase all of his requirements at one location. Again, upon being shown the 1963 suggested price list for "C" fleet operators, he changed his pre-

vious testimony and said that the purchases might be made anywhere at all. Mr. Straub, assistant sales manager for Champion, was similarly confused. He began his testimony by stating that a real estate firm owning ten or fifteen cars used by its salesmen to take prospective buyers to visit properties would be an "A" fleet operator if it maintained and serviced its equipment, but that without a garage it would not be an "A" fleet operator. On the other hand, he felt that a distributor who sold the owner of two taxi cabs spark plugs as a class "A" operator would not be violating plaintiff's fair trade contract even though the taxi cab owner did not have his own garage or his own repair shop. Earlier during pretrial discovery in response to interrogatories propounded by the defendant, plaintiff answering through Mr. Howard B. Speyer, vice president of Champion, stated that an "A" fleet had since January 1963 had the following characteristics—it consisted of *one* to nineteen vehicles, which were not required to be situated in any one place and which were not required to be serviced by their own mechanic at their own shop. Thus under the interpretation of plaintiff's vice president, of Champion's fair trade contracts, a *fleet*, contrary to what this court would have expected and contrary to the ordinary meaning of that word, can consist of as few vehicles as *one* automobile. Any consumer would then be an "A" fleet operator. Aside from plaintiff's employees' uncertainty as to the indicia of a fleet or fleet operator within Champion's own understanding, their testimony also negated the existence of any uniform, well-established meaning for the word "fleet" in the

5. Plaintiff somewhat half-heartedly urges that under Schill v. Remington Putnam, 1941, 179 Md. 83, 95, 17 A.2d 175, 22 A.2d 128, defendant as a non-signer has no standing to question the reasonableness of terms of a Fair Trade contract. This court does not believe that the Maryland Court of Appeals, in what at the most was dictum, could have intended so to rule. First, if such a ruling were intended, the court could have affirmed

on that ground, without considering the reasonableness of the agreement. Secondly, to hold that a coerced non-signer cannot contest the validity of the agreement to which without his consent he is to be bound would raise very serious constitutional questions. Thirdly, the cases relied upon by plaintiff as showing the reasonableness of its exemptions or classifications, were cases where non-signers were attacking the contract provisions.

trade or in the industry as a whole. Plaintiff's assistant sales manager testified that individual spark plug manufacturers independently undertake to define for themselves what constitutes a "fleet." One of Champion's competitors defines a fleet in terms of "the annual number of miles driven by a gasoline propelled vehicle." Another major competitor apparently defines a fleet by the number of vehicles held under common ownership.

Plaintiff relies on the case of Union Carbide and Carbon Corp. v. White River Distributors, Inc., D.C.E.D.Ark.1954, 118 F.Supp. 541, a case in which suit was brought for violation of fair trade price schedules established by Union Carbide for "Prestone" antifreeze. On the evidence presented to that court the District Court made the following finding:

> "* * * With respect to the defendant's claim that the exception contained in the 'fair trade' agreement in favor of sales to consumers 'for industrial or fleet use' is so vague and indefinite as to render the contract unenforceable, the undisputed evidence shows that the quoted phrase has and has had for many years a definite meaning in the trade; as understood by those engaged in the business, a sale to a consumer 'for industrial or fleet use' is a sale to a purchaser for installation in his own equipment, the customer maintaining regular facilities for such installation. * * * In this connection it may be said that the term 'fleet use' is, in a sense, a misnomer since the word 'fleet' suggests a number of vehicles; the undisputed evidence before us, however, is to the effect that in determining which purchasers are fleet users the number of vehicles owned is immaterial; the controlling question is whether or not the purchaser maintains regular facilities for installing the anti-freeze himself." (118 F.Supp. 541, 546–547.)

In contrast, the undisputed evidence given in the instant case by Champion's employees is that there is today no clear or definite meaning in the trade ascribed to the word "fleet," each manufacturer undertaking to define the term for itself. The controlling question, under Champion's definition of fleet in its fair trade contract, is not whether or not the purchaser maintains regular facilities for the upkeep and repair of his vehicle. Even assuming that at one time the maintenance of regular facilities for the repair and upkeep of one's vehicles was the sine qua non of a fleet operation, plaintiff intentionally and knowingly deleted that requirement from its definition of a fleet operator by its 1963 amendment of its fair trade contracts. Such deletion rendered its various classifications in its fair trade contracts based upon "fleet" operation vague, uncertain and incapable of uniform application not only by the ordinary discount house retailer but also by those experienced in the trade and industry as a whole including, significantly, plaintiff's own employees.

The cases relied upon by plaintiff to support its position that the categories established by it are reasonable are all factually distinguishable from the instant case in view of the testimony of plaintiff's employees evidencing their own inability to interpret and apply plaintiff's various classifications of fleet operators to specific situations. Nevertheless, without belaboring the issue of what constitutes a reasonable exemption, several comments might be made. Plaintiff relies on Eli Lilly v. Two Guys from Harrison, D.C.Md.1963, Civil Action No. 14492; General Electric Company v. Kimball Jewelers, 1956, 333 Mass. 665, 132 N.E.2d 652; General Electric Company v. Hess Brothers, Inc., D.C.E.D. Pa.1957, 155 F.Supp. 57; and Schill v. Remington Putnam Book Co., 1941, 179 Md. 83, 17 A.2d 175, 22 A.2d 128.

In Eli Lilly v. Two Guys from Harrison, the plaintiff's fair trade contract exempted sales made by "retailer to physicians, dentists, veterinarians, hospitals or state, county or municipal institutions." It would be hard to imagine

clearer, more precise exemptions, capable of being exactly defined and uniformly applied. In the Kimball Jewelers case the price lists attached to General Electric's fair trade contracts stated that the established fair trade prices did not "apply to sales made to employees of the General Electric Company or to sales by distributors or dealers of these products to their own employees, or to sales to governmental agencies or to commercial or institutional establishments buying for their own use and not for resale." In considering this exemption the court passed upon the reasonableness only of that portion of the exemption applying to sales to employees of the producer, of the distributors or of the retailers and to sales to governmental agencies. The court did not consider and did not pass upon the preciseness of definition which might or might not be given to an exemption of sales to "commercial or institutional establishments buying for their own use and not for resale." In the Hess Brothers case an exemption identical to the one just quoted from the Kimball Jewelers case was apparently upheld in its entirety. However, a careful reading of the case indicates that factually only that part of the exemption relating to discount sales to plaintiff's own employees was involved. Moreover, the attack on the exemption was not based on the ground advanced in the instant case,

that is that the class as defined is incapable of being determined so as to be the subject of uniform, consistent application. In Schill v. Remington Putnam Book Co., the Court of Appeals of Maryland in discussing the exemptions therein involved referred, inter alia, to "(a) books sold for circulating or public service purposes and not for resale" and to "(f) miscellaneous sales not generally intended for resale by the purchasers." The quoted language would appear to create very ambiguous, vague and general exemptions incapable of uniform application by various book sellers. Upon an examination of the record in the case, it will be found that the specific exemptions actually set out in the fair trade contract were precise and definite and that the language of the court quoted above was not the language of the contract but was rather an attempted loose characterization or a summarization of several specific exemptions in language chosen by the court as a "shorthand" method of expressing itself. The actual exemptions set forth in the contract are quoted in footnote [6] below.

■ Thus it may be seen that in none of the cases relied upon by the plaintiff was the exemption therein considered as inherently vague and indefinite as the classification herein involved of "fleet operator." In none of the cases relied upon by plaintiff was the undisputed evidence indicative of utter confusion

6. "Nothing in this agreement is intended to or shall apply to:

"(a) the operations of 'Book Clubs' in distributing to their subscribers (who shall have bound themselves in writing to purchase not less than four monthly selections or substitutes a year) their regular monthly selections, book dividends and premiums in the conduct of their regular subscription business; or to bona fide mail order houses selling exclusively by mail, except that mail order houses shall not sell books to charitable or religious organizations or to school, college, church, public or institutional libraries at a greater discount than that specified in paragraph 2 hereof.

"(b) sales (for circulating purposes or other public service and not for resale) to governmental agencies.

"(c) single copy sales of text books, school books, college books and professional or reference trade books when sold for promotional purposes only to teachers or administrative officials attached to any accredited public or private educational institution; or

"(d) the single sale of fifty or more copies of any one title; or

"(e) sales by the Publisher of any book to the author or financial sponsor of such book; or

"(f) sales for personal use to employees of the Publisher or the Bookseller."

(Records and Briefs, Court of Appeals, Volume 179 Part I, Record No. 47, page 9.)

on the part of plaintiff's own employees as to the meaning and application of the categories, classifications or exemptions established by plaintiff in its fair trade contracts. It conclusively appears that there would and could be no uniformity of application of the minimum fair trade prices set by plaintiff either by its own employees or by the trade or industry as a whole, and certainly not by a company such as the defendant, an ordinary discount house retailer and not a specialist in the automotive parts field. Accordingly plaintiff's fair trade contract cannot be enforced against defendant.

The foregoing opinion embodies the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. The court will, upon submission by defendant's counsel, sign an appropriate order dismissing the complaint in the instant case, with prejudice, with costs to the defendant.