GENERAL ELECTRIC COMPANY, A CORPORATION OF THE STATE OF NEW YORK, PLAINTIFF, v. ARNCO ELECTRONICS, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.

Superior Court of New Jersey
Chancery Division

Decided July 3, 1974.

Mr. *Richard C. Cooper* for plaintiff (*Messrs. McCarter & English,* attorneys).

Mr. *Warren J. Kaps* for defendant (*Messrs. Stein & Rosen,* attorneys).

SCHREIBER, J. S. C. General Electric Company (G.E.) instituted this action against Arnco Electronics (Arnco) for violations of minimum retail prices fixed under a contract entered into between the parties under the New Jersey Fair Trade Act. The infractions allegedly occurred on August 10, 1972 and September 16, 1972.

Arnco is a New Jersey corporation which has been engaged in the sale of electrical appliances at a store located at 77

South Washington Avenue, Bergenfield, N. J. G.E. has been engaged in the business of manufacturing various electrical appliances, including, among other items, television sets and dishwashers. G.E. utilizes a trademark "General  Electric" which is associated with its products. It has extensively promoted and advertised its appliances with this trademark, and has created goodwill in connection with it.

G.E. and Arnco entered into a minimum retail price agreement in November 1968. The contract has remained viable since that time. Under its terms Arnco agreed that it would not sell any fair-traded G.E. products at less than the minimum retail price stipulated, and would not, in connection with any sale of fair-traded products, make any discounts, allowances or concessions of any kind or character which would have the effect of decreasing the selling price. G.E. had the right in its absolute discretion to withdraw any or all of the products from the list of minimum retail prices and to add to or change or revise the prices of the products listed. Attached to the agreement was a list of the minimum retail prices for the enumerated G.E. commodities. That list stated that the minimum retail prices did not apply to: (1) sales to G.E. employees or to employees of distributors or dealers; (2) sales to governmental agencies buying for their own use, and (3) sales to a commercial or institutional customer buying four or more products for its own use and not for resale.

After execution of the contract G.E. from time to time sent to Arnco modifications of the list of minimum retail prices. It made one significant change in its exemptions by deleting the requirement that the commercial or institutional customer had to buy four or more units for its own use.

Nonretail or wholesale sales did not fall under the minimum retail price proscription. The parties stipulated that G.E. excepted from its fair trade minimum price schedules sales to apartment house builders, large residential develop-

ers and various commercial enterprises which distributed the products in the form of prizes. G.E. had a Sales Division which dealt directly with the buyers. A resale might or might not occur in these situations. For example, the apartment house builder could, after completion, retain the building and rent the apartments. Or it was possible that a company's prize might not involve a sale.

In the latter part of 1971 or the early part of 1972 Arnco instituted a program under which it distributed discount cards which entitled the . holder to purchase appliances through Arnco's wholesale organization division. Sales made by the so-called Arnco wholesale organization division were admittedly made at prices below the minimum charges that had been fixed by G.E. and in the same showroom and place as its retail business. Arnco's plan consisted of going to an employer or organization and requesting that entity to distribute, either through the employer or Arnco, discount cards to its employees or members. In this fashion the employer or association would be able to take credit for having given its employees a benefit. Although Arnold Rosen, who is president of Arnco, testified that when this arrangement was made with the Lipton Tea Company as part of the agreement with that company it was understood that Lipton Tea Company would purchase appliances for promotional purposes from defendant. Conspicuous by its absence was any evidence that such an arrangement was part and parcel of the agreement with other employers or organizations. For example, he did not testify to any such understanding when he obtained the services of the Bergen County Educational Association, an organization of school teachers, to distribute Arnco's discount cards to its members.

If any individual appeared with the discount card, it was assumed that he or she was its rightful holder. No verification or check of any kind was made. If purchases were made, cards would be made available to the members of the purchaser's immediate family. Apparently, a large number

of employers have agreed to this arrangement and, presumably, thousands of employees have received the cards.

Rosen testified that before instituting this program he had the advice of counsel that the program conformed with the New Jersey Fair Trade Act. I am satisfied that the scheme and method which Arnco utilized was simply an artifice to evade the impact of the G.E. fair trade minimum price list. The contention that these were commercial sales made to the employers or organizations of the consumer flies in the face of reality. The consumer was billed, not the employer. The consumer could well be someone who was not an employee. Arnco made no sincere effort to police the program. It was only interested in the sale. I find and conclude that the discount plan sales constituted retail sales. In so concluding I do not mean to imply that defendant believed the sales were retail. Defendant actually thought the method brought these sales within the exempt status — a commercial sale for the customer's own use. The attempt to avoid resulted in an evasion of the minimum price schedule.

As noted above, the violations allegedly occurred on August 10, 1972 and September 16, 1972. To prove the violations on those respective dates plaintiff relied upon the testimony of Herbert Schneider. Schneider was employed by a Ralph T. Piper, who operated a private investigating service. Schneider is a professional shopper, and as such has performed services which have involved products of Seagram's, Parker Pens, Mead Johnson and G.E., among others. On August 10, 1972 he went to defendant's store at 77 South Washington Avenue, Bergenfield, N. J. There he examined a G.E. portable television set and discussed its purchase with a Irving Rosen who was in charge of defendant's sales. Schneider showed Rosen a discount card on which was imprinted the name of Rex Chain Belt, Inc., one of the employers with whom Arnco had made an arrangement. The card was not signed by the employee. Rosen never took the card in his hand to examine it or attempted to verify Schneider's employee status. Because Schneider displayed that card Rosen quoted

a price of $79 — $4 less than the minimum — for a model No. WM156SBK television set. Schneider bought the set (which he subsequently delivered to G.E.) and paid $79. On September 16, 1972 Schneider returned to the store, where he was met by Arnold Rosen. Schneider was shown a portable dishwashing machine which bore the serial number GGSC431N. Schneider had identified himself to Rosen as having been a prior purchaser, and before quoting a price Rosen checked the records in the office which indicated that Schneider had in fact been a prior customer who was entitled to a discount. Therefore, he offered to sell the dishwasher to Schneider for $182, even though the fair trade price was $229.95. Schneider left a $10 deposit and returned on October 2, when he paid the balance due and picked up the dishwasher, which was also delivered to G.E. This sale was admittedly made below the minimum price because the Arnco record revealed that Schneider was a preferred customer. He became a preferred customer because he had previously utilized a discount card.

██ ██ The initial question is whether plaintiff has established that on August 10, 1972 and September 16, 1972 defendant violated its minimum retail prices. To constitute a violation the sale must be at retail. G.E. has taken the position that retail embraces all sales made to a consumer where the consumer is purchasing the item for his or her or its own use. Whether this test is to be determined by the retail seller's intent or the purchaser's is not clear. G.E. seemed to take the position that the criterion was the buyer's purpose, irrespective of the retailer's intent. Since the sales to Schneider were not for his own use, one may conclude that they were not retail sales and therefore did not constitute a violation of any minimum retail price schedule. Furthermore, even if the sales were deemed retail, Schneider was a commercial customer since he was making the purchase in connection with the business of his employer for a business purpose. Therefore, the minimum retail price schedule would not have applied because of the exemption

that the retail price schedule was not applicable where a commercial customer bought for a business use. Although there was some testimony in connection with the fact that Schneider had a bungalow colony and he may have bought the set for a tenant in the colony, the evidence is clear that the initial sale was made to him at a discount by Irving Rosen solely on the basis of the fact that he was a card holder. Since the discount price for the second sale was predicated on the first sale, it would appear to be immaterial from defendant's standpoint as to what Schneider's real purpose was in making the acquisitions. Even though the discount plan was a method which has been found to be an ineffective form, as stated above, defendant believed that its plan brought the sales into an exempt status. It is this uncertainty — who makes the decision and what is the proper determination — that calls for further consideration of the G.E. fair trade agreement.

The Fair Trade Act provides that the following are not subject to the price fixing provisions of the law: (a) a closeout of stock for the purpose of discontinuing a commodity; (b) sale of damaged goods; (c) commodities sold by any officer under orders of a court, and (d) sales to libraries. *N. J. S. A.* 56:4–5 and 56:4–4. As noted above, G.E. has increased the exempt classifications by adding three more categories: sales to certain employees, governmental agencies, and commercial or institutional customers purchasing for their own use. Defendant argues that the G.E. exemptions are illegal because the only exemptions which are permissible are those which have been set forth in the Fair Trade Act. The statutory exemptions were inserted for the benefit of the retailers and third persons. Since the act was primarily adopted to protect producers and manufacturers, producers and manufacturers have the right not only to exclude certain merchandise from the minimum price schedule but to omit certain types of transactions. Defendant relies upon *Bristol-Myers Co. v. L. Bamberger & Co.*, 122 *N. J. Eq.* 559 (Ch. 1937), aff'd o. b. 124 *N. J. Eq.*

235 (E. & A. 1938). There the buyer resold the product at a discount to the buyer's employees. The court held this constituted a violation of the fair trade agreement. In that context, namely, the buyer's right to claim exemptions, the court noted that the only exemptions were those set forth in the statute. In *Burroughs Wellcome & Co. v. Weissbard*, 129 *N. J. Eq.* 563 (Ch. 1941), aff'd 130 *N. J. Eq.* 605 (E. & A. 1942), the manufacturer's exemption from the fair trade prices on sales of pharmaceutical products to "physicians, dentists, veterinarians, clinics, hospitals and charitable institutions" was held proper and valid. The court commented (at 565), "I see no objection to the stated exemptions and, as regulated, they conform to the provisions of the statute." Since this pronouncement was more recently affirmed by the Supreme Court in *Texas Co. v. DiGaetano*, 39 *N. J.* 120 (1963), this court is bound by the stated interpretation, namely that producers may increase the number of exempt categories.

A more serious question arises when defendant charges that the exemption of sales to a "commercial or institutional customer for its own use" is vague and indefinite. It claims that what constitutes a commercial or institutional customer and when the purchase is for the buyer's own use are uncertain and indefinite. John D. MacPherson, manager of Dealer Sales Administration for the New York zone, who administers the G.E. fair trade program, contended that "commercial" or "institutional" have definitive meanings in the trade by virtue of custom and usage. I do not agree with him. His testimony in this respect was not clear and definite. MacPherson defined a commercial customer as one who, in the ordinary course of business, is not used to or is not in the habit or in the practice of paying full retail prices. He further refined this group of customers to people in business. He testified that in the industry a sale to a commercial or institutional customer would ordinarily be regarded as a retail sale to a business or institutional entity. MacPherson stated that the nature of a commercial or in-

stitutional customer does not change whether the customer is purchasing for his own use or for resale. But he also explained that the customer would be deemed a commercial customer only if the purchase were being made in connection with the business. A doctor, for example, would be a commercial customer if he bought a G.E. television set for his office, but not for his adjoining living room. Or a dentist who bought two air conditioners, one for his waiting room and one for the bedroom upstairs, would be entitled to a negotiated price on the one unit and not on the other. It is up to the dealer to make adequate inquiry of the customer. No written directives or instructions have been sent to franchised or nonfranchised dealers delineating any of the foregoing. MacPherson, as well as his assistant, Harty, claimed that franchised dealers had received these explanations orally at sales meetings. G.E. had no documentary proof to establish that fact. Arnold and Irving Rosen denied having been so instructed. I conclude that no such detailed instructions had been given to the defendant, or to other dealers, franchised or nonfranchised. MacPherson also said that in the trade all dealers know that they should, and they do, question purchasers to learn if the product is to be used in the business. I do not accept that explanation. I do not believe it. The same ambiguity applies to the definition of an institutional customer. G.E. puts out no explanatory literature on this either. MacPherson stated that "institutional" generally means a charitable or a scientific, nonprofit or educational entity. Harty considered a hospital or school as being an institutional purchaser. He agreed that the institutional customer was different from a commercial customer. On the other hand, Rosen took the position that an institutional customer was a nonprofit organization. All these interpretations point up the difficulties when a generic term is used rather than the specifics utilized in the *Burroughs Wellcome* case, *supra*.

Attention is invited to the exemption language that the commercial customer must be buying the product for his own

use. The language used in the exemption does not state that the commercial customer must be purchasing the item for his own *commercial* use. Rather, it simply states that the commercial customer must be buying the item for his own use. This, literally, may be read as applying to a situation where a commercial customer is buying the television set for his own *personal* use. Significantly, G.E. never sent out any written instructions or directions to its franchised dealers or to other dealers in G.E. appliances specifying precisely what was meant in this respect.

I am satisfied that the exemption to a commercial or an institutional customer buying for its own use has no certain or well defined meaning. Such a test leaves much to the discretion and judgment of the individual dealer. Furthermore, the distinction between a commercial customer's purchase for his commercial or personal use can hardly be viewed as fair or reasonable or as fulfilling the legitimate purpose of the law. It is true that the statute was passed primarily to protect the producer's goodwill in the trademark, but it was also intended to afford protection to the retailer and the consuming public. Upholding a fair trade agreement with this type of exemption does not serve to advance the protection of the goodwill symbolized by the G.E. trademark, nor does it afford a proper measure of protection for the retailers and the public.

There should be uniformity in application of price-fixing. Here the variables are many. In addition to those mentioned is the G.E. requirement that the fair trade price include delivery. The extent and nature of delivery varies from dealer to dealer, so that what the customer receives for that fixed minimum price depends on the dealer's practice. To attain uniformity there would at least have to be wide enough notice to all retailers of an identifiable, fixed delivery service and of precisely what is encompassed in the exemptions. Notice in this case was conspicuous by its absence. In *Burroughs Wellcome & Co. v. Weissbard, supra.,* the court, in approving a price schedule, noted:

* * * *The prices fixed are uniform.*

\*   \*   \*   \*   \*   \*   \*   \*

\* \* \* In my opinion granting exemption to physicians, dentists, veterinarians, clinics, hospitals and charitable institutions from the price structure, *where uniform*, is part of the process of fixing prices. [129 *N. J. Eq.* at 565; emphasis supplied]

The language in *Frank Fischer, etc. Corp. v. Ritz Drug Co.*, 129 *N. J. Eq.* 105 (Ch. 1941), is particularly appropriate:

\* \* \* A manufacturer or such other person entitled to operate under the statute must subject all retailers selling his commodity to restrictions which are uniform, otherwise he permits discrimination between classes of consumers and classes of retailers. Except as the legislature itself may constitutionally provide, the fixed price must apply to all consumers alike and this can be accomplished only by binding all retailers to maintain the same minimum price schedule. A manufacturer may not require or permit one group of retailers to sell at a fixed price leaving another group selling the same product free to pursue its own price policy. Similarly, the manufacturer may not, except as permitted by statute (see 1940 amendment exempting libraries) set a different price for classes of consumers. The very description of the statute as a Fair Trade Act carries with it the fundamental equitable concept that "equality is equity." Exemptions from price restriction cannot be left to the sole uncontrolled, arbitrary act of the manufacturer. [at 108–109]

*Cf. Menley & James Laboratories, Ltd. v. Vornado, Inc.*, 90 *N. J. Super.* 404 (Ch. Div. 1966).

In *Texas Co. v. DiGaetano, supra.*, The Texas Company had adopted a retail price-fixing program under *N. J. S. A.* 56:4–3 *et seq.* There the company excluded from its minimum price sales to purchasers to whom delivery is made by tank wagon or truck transport into bulk storage facilities maintained by the buyers. In approaching the problem before it the court reviewed the history of treatment of fair trade legislation through the years and cautioned that there was a "special need for judicial scrutiny of enforcement proceedings to insure that there be no perversion of the stated legislative purpose and that there be full adherence to basic equitable principles." 39 *N. J.* at 129. The Supreme Court concluded that the indefiniteness of the exemption destroyed

the validity of the fair trade schedule. It quoted a Mr. Bermingham in an article in 7 *U. C. L. A. Rev.* 161, 257 (1960) in the following pertinent fashion:

> * * * the exclusion of commercial sales leaves the door open for any retailer who wants to cut the stipulated price. He can presumably classify any employee of a business establishment as a commercial buyer, and because policing of thousands of dealers is impossible, he has little fear of his classification being challenged. [39 *N. J.* at 131]

Plaintiff has cited several cases for the proposition that its exclusion is not indefinite and should be upheld. It relies primarily on *G. E. v. Federal Employees' Distributing Co.,* 45 *Cal.* 2d 891, 291 *P.* 2d 942 (Sup. Ct. 1956). The California court upheld an exemption with about the same language as in the instant case. The court did not discuss the problems referred to herein but simply relied upon the New Jersey *Burroughs Wellcome* case and *Burroughs Wellcome & Co. v. Johnson Wholesale Perfume Co., Inc.,* 128 *Conn.* 596, 24 *A.* 2d 841 (Sup. Ct. Err. 1942), in both of which the exemptions were limited to buyers identified by occupation, all of which occupations fell into the public service field. The Connecticut court significantly wrote:

> * * * It may well be that a producer or distributor who permits a certain retailer or certain retailers to sell at prices below the minimum fixed in its schedule, or who permits exceptions to be made so generally or under such indefinite terms that its schedule ceases to maintain prices on a substantially uniform basis, would not be complying with the act. But a reasonable exception such as that provided in the plaintiff's price schedule, which it is open to any retailer to make, does not destroy the validity of the schedule. [128 *Conn.* at 603, 24 *A.* 2d at 845]

Plaintiff also relies upon *G. E. v. S. Klein on the Square, Inc.,* 121 *N. Y. S.* 2d 37 (Sup. Ct. 1953). The court upheld an exemption in terms of a commercial and institutional customer. However, here again the court did not discuss the concept with respect to vagueness or lack of uniformity. The last decision relied upon by plaintiff is *Schill v. Remington*

*Putnam Book Co.,* 179 *Md.* 83, 17 *A.* 2d 175 (Ct. App. 1941), motion for reargument denied 22 *A.* 2d 128 (1941). The court upheld various exemptions to identifiable purchasers and had one general category designated as "miscellaneous sales not generally intended for retail by the purchasers." However, the case does not discuss the contention that the exemptions stated were vague and ambiguous.

In the instant case the exemption has no certain or well defined meaning. It is vague, indefinite and ambiguous. G.E. has not definitively explained, indeed if it could, to all retailers precisely what was to be included in the exemption so as to result in a uniform program.

In view of all the foregoing I conclude that plaintiff has not established that defendant Arnco has violated its fair trade minimum price list; and, even if it has, such schedule must fail because it is vague, uncertain, and lacks uniformity. In view of these conclusions it is unnecessary to consider the other defenses raised.

Please submit an appropriate order.